# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
October 29, 2014 Session

## EMMA HARRIS ET AL. V. AMANDA B. ALDMON ET AL.

**Appeal from the Chancery Court for Knox County**
**No. 180843-2     Michael W. Moyers, Chancellor**

---

**No. E2014-00203-COA-R3-CV-FILED-MARCH 30, 2015**

---

In this appeal, the Court is asked to determine whether certain provisions of restrictive covenants recorded in 1917 are still in effect and enforceable against certain parcels of subdivision property that lay contiguous to North Broadway in Knoxville. Emma Harris filed a declaratory judgment action seeking the judgment of the trial court that a "used for residential purposes only" restriction is unenforceable as to her property due to changed conditions in the area and the abandonment of the restriction by waiver and/or acquiesence in other violations of the subject restriction. A defendant, Robert A. Whaley, a neighbor to the Harris property, filed a cross-claim seeking the same relief. The trial court, while finding that "it may well be that especially in [the] Harris[ ] case a just and equitable remedy would be the removal of the burden from her," nevertheless went on to enforce the covenant. We affirm the trial court's judgment as to the property of cross-claimant Whaley, which property is improved with a relatively-large house inhabited by Whaley as his residence since 2001. The Harris property, on the other hand, consists of two contiguous unimproved lots that have never been built on since the subdivision was created in 1917. Considering the totality of the circumstances and equities, it is the judgment of the Court that, with respect to the Harris lots, the "residential purposes only" restriction is cancelled and unenforceable, but this decree is made subject to a restriction that no curb cut will be constructed to allow vehicular access from the Harris property to Gibbs Drive, a thoroughfare leading into the subdivision from North Broadway. Our decree is also subject to the Truan/plaintiffs agreement as reflected in Exhibit 33.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed in Part with Restrictions Added and Affirmed in Part; Case Remanded**

CHARLES D. SUSANO, JR., C.J., delivered the opinion of the court, in which JOHN W. MCCLARTY, J., joined. D. MICHAEL SWINEY, J., not participating.

1

T. Kenan Smith, Knoxville, Tennessee, for the appellants, Emma Harris and Smith-Lindsey Development, LLC.

Arthur G. Seymour, Jr., and Taylor D. Forrester, Knoxville, Tennessee, for the appellant, Robert A. Whaley.

Dan D. Rhea, Knoxville, Tennessee, for the appellees, Amanda B. Aldmon, et al.

**OPINION**

I.

In the early 1900s, acreage lying on both sides of Jackson Boulevard, now named Gibbs Drive, between North Broadway on the west and Jacksboro Pike on the east, was owned by developers with the last names of Gibbs and Maloney. They subdivided their acreage into 57 lots and, in 1917, granted deeds that contain restrictive covenants with respect to the use of the subdivision lots. The restriction primarily at issue in this case provides that "said premises shall be used for residential purposes only."[1] The deeds to the lots in the subdivision–originally called the "Gibbs and Maloney Addition to Fountain

---

[1] The other restrictive covenants in the deeds are as follows:

> That if a one story house is erected on said premises, it shall cost not less than Two Thousand ($2,000.00) Dollars, and if a two story house is erected thereon it shall cost not less than Two Thousand Five Hundred ($2,500.00) Dollars.
>
> That houses erected thereon shall face on Jackson Boulevard, and shall not be located less than Fifty (50) feet from said Boulevard, and that not more than one house at a time, not including outhouses, shall be erected on any one of said lots.
>
> That said lots shall not be sold to negroes and shall not be occupied by negroes other than as servants of the owner. [All of the parties in this litigation agree that this discriminatory provision is illegal and abrogated by law.]
>
> That the said Chas. R. Gibbs, G.E. Maloney and Frank Maloney, respectively, will retain all privileges for street car, for other car tracks, gas, water, and sewer pipes in and under the streets and alleys of said addition, and no rights in said streets and alleys are here conveyed or conceded except for the purposes of ordinary travel. [Agreed to now be obsolete].

City"[2] and now called the historic Gibbs Drive neighborhood–also provide "that all these covenants and restrictions shall run with the land."

In 1978, Harris inherited two contiguous lots located in the subdivision and at its westernmost point and on the south side of Gibbs Drive. One of these contiguous lots fronts North Broadway, which has become, over the years, a heavily commercially-developed major thoroughfare in North Knoxville. Neither of the two Harris lots has ever been improved with a house or other permanent structure. The two lots together are 1.62 acres in size.

In 2001, Whaley bought the property across from the Harris lots, on the north side of Gibbs Drive. It is also contiguous to North Broadway to the west. The Whaley property is improved with a large house that he has lived in since he bought the property. Whaley's lot is approximately 1.5 acres.

On July 15, 2011, Harris and Smith-Lindsey Development, LLC, filed this action asking the trial court to declare "that the Harris lots are no longer subject to the Restrictive Covenants, and that the Restrictive Covenants have been otherwise abrogated or rendered unenforceable as a matter of law as to the Harris lots only." The complaint alleges that Smith-Lindsey contracted to buy the Harris lots, but only on condition that the subject restrictive covenant would be declared unenforceable as to the property. As later amended, the complaint further alleges:

> Currently, the Harris Lots consist of an empty field that is separated from the Gibbs & Maloney's Addition by vegetation.
>
> The Harris Lots are closest in proximity to North Broadway, and the development of the Harris Lots will not disturb the remaining lots in the Gibbs & Maloney's Addition.
>
> The area surrounding the Harris Lots has radically and significantly changed since the Restrictive Covenants were first recorded. Further, there have been radical and significant changes within the neighborhood, such that the neighborhood has effectively abandoned the restrictive covenants. There have been businesses operating in the neighborhood for years. The waiver and/or abandonment has risen to the level of community acquiescence. The

---

[2] Fountain City was an unincorporated city lying north of the city of Knoxville before it was annexed into Knoxville effective February 11, 1962.

neighborhood has <u>not</u> been used for <u>residential purposes only</u>. There have been radical changes occurring inside the neighborhood and in near proximity to the neighborhood.

Since the Restrictive Covenants were first recorded, the area surrounding the Harris Lots has been extensively developed for commercial and retail use. With one (1) exception, all other parcels fronting on North Broadway within at least one (1) mile of the Harris Lots (in either direction) have been developed and are being used for commercial and retail purposes.

(Underlining in original; numbering in original omitted.)

To assist the reader in understanding (1) the location of the Harris lot and the Whaley two-story, columned house, (2) their relationship to each other, (3) the Kroger store, and (4) North Broadway, we have reproduced Exhibit 15 from the record.



Exhibit 15

This exhibit clearly shows, on the left of the photograph, the Kroger store and traffic on North Broadway, a four-lane highway for traffic proceeding north and south. This photograph also shows the Christmas tree business located on the Harris lots, including a camper-trailer, two parked vehicles, parts of two vehicles parked in the foreground of the photograph near the Chick-fil-A restaurant, and other things assorted with the business. Whaley's columned home is circled. The vegetative barrier between the Harris lots and property owned by a couple named Truan is on the far right of the photograph. The photographer is situated near the south boundary of the Harris lots, which is also the north boundary of the Chick-fil-A.

The complaint named as defendants the other property owners in the subdivision. Whaley, a named defendant, filed a notice indicating his consent to the relief sought by Harris. Three other landowners in the neighborhood also filed notices of consent, including, interestingly enough, the owners of the property on the east boundary of the Harris lots, Kevin Truan and Helen Truan. The Truans' consent was dependent on certain enumerated conditions, primarily that the new owners of the Harris property would create and maintain an appropriate buffer zone of fencing and landscaping between their property and the Harris lots. The other landowners in the neighborhood opposed the removal of the restrictive covenants.

Whaley filed a cross-claim requesting that his property also "be declared to no longer be subject to the restrictive covenants set forth in the Gibbs and Maloney Deed as such restrictive covenants have been abandoned or have been abrogated by changed circumstances and thereby rendered unenforceable as a matter of law" as to his property. Whaley alleged that he had tried to sell his property, but that no one was interested in buying it as residential property. An attorney had offered to buy it for the dual purpose of living in the house and using it as a law office. Apparently, that deal fell through when the neighborhood association told Whaley that it would oppose the erection of any sign on the property advertising a law office.

A substantial part of the evidence offered at the bench trial revolved around the activity in the neighborhood that was alleged to have violated the "residential purposes only" covenant–predominantly home-based businesses where occupants did some kind of work out of their homes. It was generally undisputed that the area around the subdivision along North Broadway in the Fountain City area of Knoxville has radically changed since 1917, becoming intensely and almost exclusively commercial. The trial court found that the original object of the restrictive covenants "was the creation and preservation of a residential neighborhood, and to all appearances that is exactly what the restrictions have achieved, regardless of what incidental and unobtrusive home occupations may be occurring behind closed doors." The trial court further stated as follows:

5

[T]hese findings result in a substantial burden upon the Plaintiffs, especially Miss Harris who, it is credibly argued, cannot make any reasonable use of her property as it is currently situated. The evidence is uncontroverted that the burden upon her estate is great, and that so long as it is subject to the restrictions set forth in the 1917 covenants, it cannot reasonably be developed for any purpose consistent with the covenants, as it is entirely surrounded by commercial uses and fronts a road (North Broadway) that since 1917 has evolved from a sleepy boulevard to a major commercial and arterial hub.

\* \* \*

[I]t may well be that especially in Miss Harris' case a just and equitable remedy would be the removal of the burden from her (and perhaps Mr. Whaley's) property alone, keeping the covenants in place for the remainder of the community. However, equity must follow law, and while the Plaintiffs have presented some precedent from other jurisdictions suggesting that courts may under similar circumstances choose to remove selected properties from the burden of restrictive covenants on a theory of comparative benefit, thus far no Tennessee Court has suggested that our courts of equity enjoy such authority.

It is apparent from a reading of the above, and other comments of the trial court, that the court considered itself bound by an "all or nothing" legal principle requiring it to eliminate the restrictive covenants either as to all of the subdivision properties, or none of them. As can be seen, the trial court followed this perceived rule of law and found that the court was without authority to fashion an equitable remedy that removed or modified the subject restriction from less than all of the subdivision lots. Both Harris and Whaley timely filed a notice of appeal.

II.

The issue raised by both the plaintiffs and Whaley is whether the trial court erred in refusing to declare the subject restrictive covenant unenforceable as to their respective properties due to changed conditions and abandonment by waiver and/or acquiescence. Harris raises the additional issue of whether the trial court erred when it held that the

6

original restrictive covenants were binding on successor owners of the property based upon language in the deeds stating that the covenants "shall run with the land."

III.

The facts in this case are essentially undisputed. The only questions presented to us raise purely legal issues. As legal issues, there is no presumption of correctness as to the trial court's legal conclusions. *Kendrick v. Shoemake*, 90 S.W.3d 566, 569 (Tenn. 2002); *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 35 (Tenn. 1996). These are issues solely for us.

IV.

A.

We will first address the issue raised only by Harris, *i.e.*, whether the trial court correctly held that the restrictive covenants are binding on successor grantees. The original deed to every subdivision lot expressly provides that "all these covenants and restrictions shall run with the land." We recently addressed this issue in *State v. Dyskin*, No. E2013-02286-COA-R3-CV, 2015 WL 382709 at *3 (Tenn. Ct. App. E.S., filed Jan. 30, 2015), stating as follows:

> Almost a century ago, the Supreme Court . . . reiterated the following rule:
>
>> The question then arising is whether the said covenant runs with the land, or was personal to the grantees under the deed. This court has in several decisions adhered to the second resolution in Spencer's Case, 5 Co. 16, [77 Eng. Rep. 72 (Q.B.1583) ] and held that a covenant in respect to something not in esse must specifically bind the assignees of the covenantor in order for such covenant to run with the land.
>
> *Carnegie Realty Co. v. Carolina, C. & O. Ry. Co.*,189 S.W 371, 372 (Tenn. 1916). The High Court has reaffirmed and applied this rule several times. *Farrar v. Nashville, C. & St. L. Ry.*, 36 S.W.2d 95, 98 (Tenn. 1931); *Lowe* [*v. Wilson*], 250 S.W.2d [366,] 367 [Tenn. 1952]. This Court has done likewise. *See Essary v. Cox*, 844 S.W.2d 169, 171 (Tenn. Ct.

App. 1992); *Hillis v. Powers*, 875 S.W.2d 273, 275 (Tenn. Ct. App. 1993); *Tennsco Corp. v. Attea*, No. M2001–01378–COA–R3–CV, 2002 WL 1298808 at *2 (Tenn. Ct. App. M.S., filed June 13, 2002).[3]

(Footnote in original.)   The rule reflecting the language described in *Dyskin* and the earlier cases is implicated in this case.   The phrase "running with the land" or its functional equivalent has been defined as follows: "A covenant is said to run with the land when either the liability to perform it or the right to take advantage of it passes to the assignee of that land." *Black's Law Dictionary*, 6th ed. (1990) at 1333.   Tennessee courts have consistently used "running with the land" as a legal term of art synonymous with the concept of "binding on future grantees or assignees." *See, e.g., Dyskin*, 2015 WL 382709 at *3.   The intention of the original grantors in this case to bind remote grantees, as expressed in the language of the original deeds, is clear.   The restrictions are applicable to Harris and the other owners in the subdivision.   The trial court correctly resolved this issue.

B.

The plaintiffs and cross-claimant argue that the trial court should have held the restrictive covenant unenforceable as to their respective properties on the ground of changed conditions in and around the subdivision.   They further assert that the defendants have abandoned the restriction requiring that property in the subdivision be used "for residential purposes only."   The leading case in Tennessee on the "changed conditions" concept is *Hackett v. Steele*, 297 S.W.2d 63 (Tenn. 1956).   The *Hackett* Court addressed circumstances and allegations similar in some respects to those in the present case.   In *Hackett*, the action "was filed by the owners of certain lots in a subdivision restricted to residences for the purpose of having these restrictions cancelled on the basis that there had been such a radical change in conditions as to make the enforcement of said restrictions inequitable against the owners of the lots." *Id.* at 63.   The restriction provided that for fifty years from the date of execution of the deed, "no building other than a dwelling or building ordinarily appertaining to dwelling houses shall be erected, maintained or used by the grantees, their heirs or assigns[.]" *Id.* at 64.   The plaintiffs in *Hackett* alleged that

---

[3] We have also twice observed that "[w]hile this result has been criticized, *see* Case Comment, 22 Tenn. L.Rev. 971 (1953), this court has consistently followed the rule, and the Supreme Court so far has refused to review it." *Tennsco Corp.*, 2002 WL 1298808 at *2; *see also Leach v. Larkin*, No. 919193, 1993 WL 377629 at *5 n.8 (Tenn. Ct. App. M.S., filed Sept. 24, 1993). Thus, "the rule requiring specific language in the deed remains intact." *Tennsco Corp.*, 2002 WL 1298808 at *2.

Through the lapse of time from 1922 until 1954, when this bill[4] was filed, McCallie Avenue . . . has changed from a residential neighborhood to commercial and is a part of U. S. Highway No. 11, which runs east from McCallie Avenue out Brainerd Road; this latter has been widened into a four-lane highway, is heavily traveled and now built up with various sorts of business establishments on out to where said subdivision is located and the same is now within the city limits of Chattanooga.

*Id.* (footnote added). The Supreme Court discussed the applicable legal principles stating, in pertinent part, as follows:

[W]e first call attention to the fact that a difference is pointed out between the situation where an *injunction* is sought to enjoin the violation of the restrictive covenant on the one hand, and on the other hand where there is a proceeding in equity for the purpose of *cancelling* the restrictions completely. The difference is, of course, that once the restrictions are done away with all litigation in regard thereto is forever after foreclosed.

\* \* \*

[D]espite the tendency of some American Courts to adopt a doctrine of comparative benefits, and while a radical change in conditions and in the neighborhood surrounding restricted property will deter practically all American Courts from granting injunctive relief, an analysis of the cases as a whole discloses that equity will enforce restrictive covenants imposed for the benefit of the complainant's property, if they remain of substantial value, notwithstanding the resulting hardship to the servient estate, where the complainant comes into Court with clean hands and guiltless of laches, waiver or estoppel.

\* \* \*

---

[4] Prior to the adoption of the Rules of Civil Procedure, the leading pleading in chancery court was called a "bill."

> To sum up, Courts of Equity, in passing upon cases of this character, grant or withhold injunctive relief depending upon the accomplishment of an equitable result in the light of all the circumstances surrounding the particular case and grant or withhold affirmative relief depending upon whether the restrictive covenant remains of substantial benefit to the dominant estate or whether its purpose has been defeated by a radical change in the character of the neighborhood.

*Id.* at 66 (quoting 4 A.L.R.2d at 1114, 1116 (1949)) (emphasis in original).

The *Hackett* Court, quoting at length with approval the case of *Bickell v. Moraio*, 167 A. 722 (Conn. 1933), went on to say the following:

> The creation, in a building development scheme, of an area restricted to residential purposes, contemplates the continued existence of such an area from which business is excluded. That it also contemplates that business may extend to the confines of the area is apparent, since it is to prevent the encroachment of such business into the protected area that the restrictions are created. Purchasers of lots in such an area buy in reliance upon the fact that all other lots in the area are subject to the same restrictions as those contained in their own deeds, and that the entire development will retain its character as a purely residential district. So long as it remains possible to carry out the original purpose of the development, each purchaser of a lot has a right to the protection of his easement in all the other lots in the restricted area, *in the absence of conduct on his part constituting laches, waiver, or abandonment.* It is only when there has been a radical change in the conditions existing when the restrictive covenants were created which completely defeats the objects and purposes of the covenants so that they are no longer effective, and their enforcement would not afford the protection which was in the contemplation of the parties, that equity will hold the restrictions no longer enforceable.

*Id.* at 67 (emphasis added).

This Court has applied the principles espoused in *Hackett* to deny declaratory relief sought by plaintiffs in two later cases. *Caudill v. Hamlet*, 490 S.W.2d 538, 542

10

(Tenn. Ct. App. 1972) (declining to remove restrictive covenants where "it appears that this subdivision of eighty-one lots constitutes a comparatively large residential area and that no relaxing of the covenants requiring the building of residences only has occurred"); *Russell v. Merrywood-Kingston Pike Estates Neighborhood Ass'n, Inc.*, No. 03A01-9801-CH-00014, 1998 WL 474079 at \*2-3 (Tenn. Ct. App. E.S., filed July 29, 1998). In *Russell*, we observed the following rationale for the general principles stated in *Hackett*:

> [T]he reason to avoid granting such relief is well stated in 20 Am.Jur.2d *Covenants, Etc.*, § 247 p. 670-1:
>
>> Generally, the fact that a small portion of a restricted district, lying along the edge or at the threshold thereof, is thus forced to bear the brunt of attack from changed conditions outside the district, with resultant impairment in value for the use prescribed by the restrictions, does not justify abatement of the restrictions as to the part affected because of the hardship visited upon that particular land as compared with the sheltered or interior portion of the district, the view being that one of the best places to hold the line against encroachment of business and commerce upon the restricted area is at a highway or street, since otherwise there would be started a system of gradual encroachment which might swallow up the entire residential area, with the interior tiers of lots "falling like ten pins" once such encroachment began.
>
>> [M]ost convincingly, the fact that the complaint does not factually negate the proposition that as a matter of equity most, if not all, of the remaining restricted lots benefit from the restrictions, and those parties under the complaint have a basis in equity to enforce the restrictive covenants for the protection of their property.

1998 WL 474079 at \*2-3 (quoting 20 Am.Jur.2d *Covenants, Conditions and Restrictions* § 247 at pp. 670-71).

We have also applied *Hackett* to grant injunctive relief to landowners bringing suit to enforce restrictive covenants against neighbors attempting to use their land in ways

that violated the restrictions. *See Hewgley v. Vivo*, No. 01A01-9506-CH-00266, 1997 WL 92077 at *2 (Tenn. Ct. App. M.S., filed Mar. 5, 1997) (observing that restrictive covenants "can lose their force when they fail to serve a useful purpose" and "may be rendered unenforceable if radical changes in the character of the entire neighborhood completely defeat the purpose of the covenant" and stating, "[w]hen determining whether a restrictive covenant continues to serve any useful purpose, the courts must be concerned primarily with the continuing value of the restrictive covenant to the entire neighborhood, not the hardship to the parties attempting to avoid the restrictive covenant"); *Jones v. Englund*, 870 S.W.2d 525, 528 (Tenn. Ct. App. E.S., filed Aug. 20, 1993) (proof showing increased traffic and number of year-round residents "does not represent the kind of material change that would justify a suspension of the restrictions in the deeds").

As can be seen from the above-cited authorities, the test for determining whether a restrictive covenant has become unenforceable due to changed circumstances is a stringent one, and has rarely resulted in relief to the party seeking avoidance of the restriction. *But see Hysinger v. Mullinax*, 319 S.W.2d 79, 81 (Tenn. 1958) (applying, as the law of the case, earlier Chancery Court decision that "*it would be inequitable to enforce the restrictive covenants under existing circumstances*," that neighborhood "had ceased to be desirable for residential purposes" and concluding that "the Chancellor was eminently correct in holding that it would be inequitable to enforce these restrictive covenants") (emphasis in original). The plaintiffs and cross-claimant in this case have alleged, however, that in addition to the changed circumstances in the character of the relevant area from residential to commercial, the other subdivision residents have abandoned the restrictions, by waiver and/or acquiescence, in failing to object to various non-residential uses of multiple properties in the neighborhood over the years.

The parties agree that the general legal principles applicable to such a claim of abandonment were set forth by this Court in *Scandlyn v. McDill Columbus Corp.*, 895 S.W.2d 342, 349 (Tenn. Ct. App. 1994):

> [R]estrictive covenants are rendered unenforceable by abandonment. Abandonment is defined as "community acquiescence" to continued violations of such restrictions.
>
> However, in order for community violation to constitute an abandonment, it must be so general as to frustrate the object of the scheme *with the result that enforcement of the restriction involved would seriously impair the value of the burdened lot without substantially benefiting the adjoining lots*. Accordingly, sporadic and distant violations do not in themselves furnish adequate evidence of abandonment,

12

*although they may be considered in connection with outside changes.* 20 Am.Jur.2d *Covenants, Conditions, Etc.* § 272 (1965).

The right to enforce a restrictive covenant may be lost due to such acquiescence by waiver or estoppel:

> This is so, for instance, where, by failing to act, one leads another to believe that he is not going to insist upon the covenant, and such other person is damaged thereby, or whereby landowners in a tract or subdivision fail to object to general and continuous violations of restrictions. If the party entitled to the benefit of the covenants in any way by inaction lulls suspicion of his demands to the harm of the other *or if there has been actual or passive acquiescence in the performance of the act complained of, then equity will ordinarily refuse aid.*

20 Am.Jur.2d *Covenants, Conditions, Etc.* § 273 (1965).

(Emphasis added); *see also Strickler v. Garrison*, No. 03A01-9705-CH-00181, 1997 WL 772848 at *5 (Tenn. Ct. App. W.S, filed Dec. 11, 1997); *Ruth v. Cove Creek, LLC.*, No. 03A01-9805-CH-00167, 1999 WL 172644 at *1 (Tenn. Ct. App. E.S., filed Mar. 24, 1999) (noting that "other landowners, including some of the Plaintiffs, violated the restriction by erecting various outbuildings and multiple car garages. We do not believe, however, that Cove Creek has borne its burden to show that such violations are so wide spread as to vitiate the restrictive covenant the Plaintiffs seek to sustain"); *Wilson v. Woodland Presbyterian School*, No. W2001-00054-COA-R3-CV, 2002 WL 1417064 at *4 (Tenn. Ct. App. W.S., filed June 25, 2002) ("in order to establish abandonment, the defendant must show that there were previous violations of the covenants in which the community acquiesced, and that these violations frustrated the community's restrictive scheme").

In *Taylor v. Burleson*, No. E2001-02381-COA-R3-CV, 2002 WL 1870269 at *1, (Tenn. Ct. App. E.S., filed Aug 15, 2002), the plaintiffs "sought to invalidate subdivision restrictive covenants on grounds [that] other lot owners had violated the restrictions." The restriction under attack provided "that the lots are to be used for residential purposes only." *Id.* In analyzing the abandonment claim, we stated as follows:

13

Plaintiffs attack these restrictions on the grounds that one of the lots is used by a church, and there was a lot that was used as a nursing home, and other lots have been used for "cottage industries," such as a pet shop, beauty salon and photo studio.

\*　　\*　　\*

In order to constitute abandonment, violations must be "so wide spread [sic] as to vitiate" the restrictive covenant at issue.  In a case factually analogous, the Court in **Hardesty v. Silver**, 302 S.W.2d 578 (Ky. Ct. App. 1956), found that there were homeowners with home-based businesses in the development, but concluded that acquiescence in "slight and inconsequential" violations would not prevent another property owner from objecting to a substantial violation.  Similarly, in this case the prior violations, a beauty shop, an antique shop, and a nursing home, as well as the current violations of a pet shop and photo studio, have all consisted of residences which had an incidental business use in them as well.  The only exception is the church, but it has not been characterized as "commercial" by anyone but the plaintiffs, and it was clear that none of the homeowners even knew it was in the subdivision until this action was filed.  The houses with the businesses were not altered in any way, and in most cases, there was no outward manifestation which would indicate that any business was located therein.  These past and current uses are significantly different from plaintiffs' proposed use, which will be a large, completely commercial structure in both appearance and purpose.

We hold that the Trial Court was correct in finding that the residential character of the neighborhood has not been abandoned.  The evidence preponderates that there has been no community acquiescence which would be sufficient "to frustrate the object of the scheme with the result that enforcement of the restriction involved would seriously impair the value of the burdened lot without substantially benefitting the adjoining lots."  **Scandlyn v. McDill Columbus Corp**., 895 S.W.2d 342 (Tenn. Ct. App. 1994).

14

2002 WL 1870269 at \*1, 2 (internal citations omitted).

In ***Kerney v. Endres***, No. E2008-01476-COA-R3-CV, 2009 WL 1871933 (Tenn. Ct. App. E.S., filed June 30, 2009) ("***Kerney*** I"), the plaintiffs alleged that the operation of an in-home beauty salon violated the neighborhood restrictive covenants "that the property shall be used for residential purposes only and not 'any commercial undertaking.' " *Id.* at \*3. The beauty shop owners responded that the home business was merely incidental to their residential use of the property, and did not violate the covenant. We said:

> ***Carr v. Trivett***, [143 S.W.2d 900 (Tenn. Ct. App. 1940)], . . . illustrates that the courts of Tennessee are in agreement with the general proposition that whether an incidental use of residential property for business purposes is in violation of a covenant restricting use to residential purposes depends upon the wording of the restriction and the extent and nature of the use.
>
> \*       \*       \*
>
> We understand that in a case where one use is explicitly permitted but the actual use is not exactly within the permitted use, some analysis should be made to determine whether the actual use should be allowed as incidental to the permitted use. We are not convinced, however, that an actual use which is explicitly prohibited will be allowed to continue as incidental to a permitted use. For example, in ***Laughlin v. Wagner***, 244 S.W. 475, 478 (Tenn. 1922), a residential restriction resulted in the holding that lots could be used for purposes incidental to residential use, such as flower beds and walkways, but not as driveways to a prohibited business use.
>
> Furthermore, we do not agree that defendants' beauty salon was merely an incidental use. . . . To borrow again from the language in ***Carr***, "We think such an undertaking is substantially different from the incidental use of a dwelling for purposes, not strictly residential in character, from which the owner derives some income or profit but which may not, by any fair construction, be termed a business or trade." ***Id***. at 903. Defendants were clearly running a business out of their home.

15

*Kerney* I, 2009 WL 1871933 at *5.

Following our remand of *Kerney* I to determine whether there had been an abandonment of the restrictive covenant by waiver and/or acquiescence, it was again appealed. *Kerney v. Endres*, No. E2010-02217-COA-R3-CV, 2011 WL 5331690 (Tenn. Ct. App. E.S., filed Nov. 7, 2011) ("*Kerney* II"). We stated as follows:

> Although the Trial Court found commercial use of six surrounding parcels, the evidence in the record on appeal reveals that the alleged commercial uses included two high school or college age individuals who mowed lawns or gave swimming lessons, a neighbor who parked work-related vending trucks at their property, and three past businesses, i.e., an automobile detailing business and two day-cares, all three of which closed some time ago. . . .
>
> [W]e do not agree that the young individuals who mow lawns or give swimming lessons qualify as commercial businesses which would be violations of the restrictive covenants "so pervasive 'as to frustrate the object of the scheme with the result that enforcement of the restriction involved would seriously impair the value of the burdened lot without substantially benefiting the adjoining lots.' " Nor do we agree that a neighbor who parks a work-related vehicle in a driveway meets this standard. Furthermore, the other neighbors from the subdivision . . . were completely unaware of any businesses in the neighborhood other than Defendants' beauty shop, and the young man who mows lawns. . . . The preponderance of the evidence in the record shows sporadic and non-pervasive violations, at best, which are insufficient to prove community waiver or abandonment.

*Kerney* II, 2011 WL 5331690 at *5 (internal citations omitted).

In *Roberts v. Bridges*, No. M2010-01356-COA-R3-CV, 2011 WL 1884614 (Tenn. Ct. App. W.S., filed May 17, 2011), we again addressed an alleged violation of a "residential purposes only" covenant, and stated:

> This Court has previously held that the restriction of permitted uses to "residential purposes only" means a

16

property "is limited to use for residential, as opposed to commercial or other purposes." *Parks v. Richardson*, 567 S.W.2d 465, 470 (Tenn. Ct. App. 1977); *see also Carr v. Trivett*, 143 S.W.2d 900, 903 (holding that a restrictive covenant providing that property "shall not be used except for residential purposes" is "clear and unambiguous and cannot be reasonably construed otherwise than as a prohibition against the use of the property for any purposes other than for residential purposes"). Tennessee courts, however, have distinguished between the principal use of a property for non-residential purposes and "the incidental use of a dwelling for purposes, not strictly residential in character, from which the owner derives some income or profit but which may not, by any fair construction, be termed a business or trade." *Carr*, 143 S.W.2d at 903. . . .

Courts in other jurisdictions have reached different conclusions on the effect of a restrictive covenant requiring use of property for "residential purposes only." Some courts interpret this and similar language as establishing "a bright line rule which prohibits any commercial or business use of property." . . .

A second approach avoids restricting minor or insignificant commercial activities, focusing on the purpose of restrictive covenants "to preserve the residential character of the neighborhood and to make the neighborhood more attractive for residential purposes." This approach rejects a bright-line rule and permits incidental commercial use if the "use is in fact casual, infrequent, or unobtrusive and results in neither appreciable damage to neighboring property nor inconvenience, annoyance, or discomfort to neighboring residents." This approach, however, requires "such additional use to be so reasonably incidental to the prescribed use and such a nominal or inconsequential breach of the covenants as to be in substantial harmony with the purpose of the parties in the making of the covenants, and without material injury to the neighborhood."

We adopt the latter approach to the enforcement of restrictive covenants. . . . Unless prohibited by the plain language of a

17

restrictive covenant, we conclude the incidental use of a property for commercial purposes is permissible if it is in fact casual, infrequent, or unobtrusive and results in neither appreciable damage to neighboring property nor inconvenience, annoyance, or discomfort to neighboring residents.

We agree with the trial court that the gathering of employees, the parking of their vehicles for extended periods, the parking of the large tour bus, and the parking of panel trucks on Homeowners' property solely in the furtherance of Mr. Bridges's music business constituted use of the property for commercial purposes.

2011 WL 1884614 at *7-9.

With these legal principles in mind, we now turn to the evidence presented at trial. Seven witnesses testified: Harris and Whaley; James Smith, a representative of plaintiff Smith-Lindsey Development; real estate expert Richard Smith; and three neighborhood landowners. Numerous photographs, and a video of a driving tour up and down Gibbs Drive that depicted the neighborhood, were introduced. Very few, if any, of the facts presented into evidence were or are now disputed. The testimony established that several residents were operating home-based businesses of various kinds. Much attention was focused on a former electrical contracting business that had been located at one of the houses that had been owned by the Marlow family. Daniel Marlow testified that he formerly lived at 2815 Gibbs Drive, next to the property adjacent to the Whaley lot, and ran a business called Electric Service Company. He had his employees park company vans on the property and stored certain equipment and inventory outside on the property. Counsel for the defendants conceded that this activity on the Marlow property was commercial activity violative of the "residential purposes only" restriction, but argued that it was a singular and isolated case. It was undisputed that at time of trial, Marlow had sold the house and it was then being used solely as a family residence. It was also undisputed that every year since the 1980s, for about six weeks before Christmas, Christmas trees and wreaths were sold off of the Harris lots – a significant fact that we will discuss in greater detail below.

The trial court entered an extensive memorandum opinion and final order finding and holding, in pertinent part, as follows:

The Gibbs and Maloney Addition (hereinafter referred to as "the subdivision") runs along what is now known as Gibbs

18

Drive, extending from North Broadway . . . to Jacksboro Pike. [T]here are roughly 52 [houses] in the subdivision. The entirety of the property, including the parcels owned by the Plaintiffs, is zoned R-1 Residential by the City of Knoxville. The street, and all of its homes, has been included on the National Register of Historic Places by the Department of the Interior.

* * *

North Broadway over the years since the creation of the subdivision has evolved into a major arterial highway carrying heavy residential and commercial traffic, including semi-trucks. To the west of the subdivision, directly across Broadway, is a large Kroger Grocery store. To the south of Miss Harris' lots is a new fast food restaurant.[5] To the north of Mr. Whaley's property is another multi-business retail development. The evidence indicated that the whole of Broadway from the I-640 interchange to north of the Plaintiffs' property is devoted to retail and commercial development. . . .

Plaintiff Emma Harris testified that she had owned the property (held previously in trust for her) since 1978. She testified that in that time she had received many offers to purchase the property for commercial development but had received no offers for development of the property as a residence. She lives in Nashville and apparently has no interest in using the property as a residence for herself.

Mr. Whaley testified that he had purchased his house in 2001 and had done extensive renovations on it. He testified that he was in ill health and needed to sell it, but has received no offers on his half-million asking price except from persons interested in use of the property for commercial purposes. He testified that he did receive an offer to purchase the property from a lawyer who intended to use the home as a law office; however, the offer was apparently rescinded when the community objected to the attorney's plans to erect a sign in

---

[5] Chick-fil-A.

19

front of the building. The defendants are the remaining property owners in the subdivision.

The Plaintiffs' evidence chiefly consisted of testimony regarding various ways in which they claim that the subdivision is not enforcing the covenants and restrictions.

\* \* \*

Apart from the Marlow property, the remainder of the Plaintiffs' evidence concerned various other properties in which it was alleged that there are or were home based businesses operating, including a lawn mowing service, a carpenter, piano teacher, and an insurance agent. The testimony indicated that all of these activities were undertaken by the residents of the home (with the exception of Mr. Helton the insurance broker, whose non-resident girlfriend also acted as his secretary.) The evidence was that these businesses generated little if any traffic or noise in the neighborhood and none of the homes in the neighborhood are adorned with any signs or other external indicia of commerce.

\* \* \*

The businesses, apart from the Marlow business, appear to be in the nature of "home offices," wherein the residen[ts] have carried on business activities incidental to their residence within. No evidence has been adduced that any residences have been used for large or even small scale retail use, and none have been storefronts in which absentee owners merely used the homes as business addresses while residing elsewhere.

\* \* \*

In the present case, apart from the Marlow property, it appears that all of the alleged "commercial activity" in the neighborhood was incidental to the primary use of the properties as residences (and in fact even the Marlows resided on the property from which they operated their business.) There presently are no external indicia of commerce in the

neighborhood. The video tour of the neighborhood introduced as Exhibit 45 and the photographs of the homes in the neighborhood, introduced as collective Exhibit 46, indicate that for all appearances the neighborhood is entirely residential.. . . .

The evidence . . . suggests at most the kind of "sporadic and non-pervasive" violations (if violations they are, *see **Roberts v. Bridges**, supra*) that do not rise to the level of demonstrating that they "frustrate the object of the scheme" that underlay the imposition of the restrictions. It seems clear to the Court that the "object" of the original Grantors of the Gibbs and Maloney Addition was the creation and preservation of a residential neighborhood, and to all appearances that is exactly what the restrictions have achieved, regardless of what incidental and unobtrusive home occupations may be occurring behind closed doors.

(Footnote added.) The trial court believed that removal of the subject restriction solely from the Harris property "(and perhaps Mr. Whaley's)", while leaving that restriction in effect as to all the other properties, would be an equitable result under the circumstances. Nevertheless, the trial court found that it lacked the authority to do so. We disagree with that legal conclusion.

In **Land Developers, Inc. v. Maxwell**, 537 S.W.2d 904, 917 (Tenn. 1976), the Supreme Court observed that,

the defendants below insisted that there has been such a material change in the character of the vicinity and such growth of commercial development in and around it as to justify the Court, acting on equitable principles, to terminate all residential restrictions *on the subject property. The courts in this state have such power, and in appropriate cases have exercised it*. . . . The legal theory governing such relief and the type of proof required to justify it are discussed fully in the case of **Hackett v. Steele**, 201 Tenn. 120, 297 S.W.2d 63 (1956).

(Emphasis added.) The **Hackett** Court stated that "Courts of Equity, in passing upon cases of this character, grant or withhold injunctive relief *depending upon the accomplishment of an equitable result in the light of all the circumstances* surrounding

the particular case." 297 S.W.2d at 66 (emphasis added). In **Caudill**, the trial court cancelled restrictive covenants on 9 of the 81 lots in a subdivision, leaving the other lots subject to the covenants. 490 S.W.2d at 538. Although this Court reversed the decision, we did not do so on the grounds that the trial court had authority only to cancel either all or none of the restrictive covenants, nor did we hint at any such rule. We have reviewed all of the above-cited Tennessee opinions, and summaries of jurisprudence from other jurisdictions, *i.e.*, Restatement (Third) of Property (Servitudes) § 7.10 (2000), *Modification and Termination of a Servitude Because of Changed Conditions*; § 7.4, *Modification or Extinguishment by Abandonment*; 25 A.L.R.5th 123 (1994), *Waiver of Right to Enforce Restrictive Covenant by Failure to Object to Other Violations*; 76 A.L.R.5th 337 (2000), *Change in Character of Neighborhood as Affecting Validity or Enforceability of Restrictive Covenant*; 1 A.L.R.6th 135 (2005), *Construction and Application of "Residential Purposes Only" or Similar Covenant Restriction to Incidental Use of Dwelling for Business, Professional, or Other Purposes*. None of these authorities suggest an "all-or-nothing" rule preventing a court from cancelling or modifying restrictions on equitable principles for only one, or some, of the properties in a subdivision. Furthermore, such a rule would remove the flexibility useful in analyzing properties that are separate and unique. We hold that the trial court did have authority to remove the covenants from less than all of the properties.

We further hold that under the unique circumstances of this case, fairness and equity require a holding that the subject restrictive covenant on the Harris property is unenforceable for the following reasons. First, there has been such a radical change in conditions and the area surrounding the Harris property that (a) it no longer "appears" to be part of the subdivision and (b) it is impossible for her property to be used in the manner intended in the original deeds. Real estate expert Richard Smith testified that the property is unsuitable and unmarketable as residential property, and therefore nearly worthless as long as the restrictive covenant is enforced as written. Defense counsel conceded the correctness of this opinion, and, at oral argument, also conceded the unfairness of Harris' situation as it currently stands. Second, the properties of Harris and Whaley are the only lots in the subdivision uniquely situated so that the commercial development has encroached upon their properties from multiple sides. We have viewed the photographs and video submitted into evidence. The Harris property is, simply stated, an open field. To the west is North Broadway, unobstructed by landscaping or anything else, and across the street is a large Kroger shopping center. To the south is a newly-opened Chick-fil-A restaurant, also unobstructed. To the north is Gibbs Drive and Whaley's property across the street, partially obstructed by a wooded area. To the east is a wooded area that separates the Harris property from the rest of the neighborhood and the adjacent Truan property.

Third, the expert testimony of Richard Smith establishes that the property could be developed with landscaping that would maintain and even improve the residential character of the rest of the neighborhood.  Smith testified in his affidavit that,

> [t]he lots at issue (2800 Gibbs Drive and 2806 Gibbs Drive) could be developed commercially with an appropriate buffer of trees, shrubs and a privacy fence which would result in minimal impact, if any, on the Gibbs Drive neighborhood.  In fact, in my opinion, an improvement of the existing buffer to include some evergreen trees would actually be a significant improvement to the privacy of the neighborhood.

He testified at trial that if there were a sufficient buffer maintained, the Harris property could be developed without impacting the Gibbs Drive neighborhood behind it, and further stated as follows:

> [B]eing able to assure that this barrier that's there now and even conceivably better than what's there – because they're going to put a fence and evergreens; there's no real evergreens in it now – if that was there, I think it's a great improvement and would protect the neighborhood.  It would be actually beneficial, I believe, to the neighborhood.  Because what's there now, as it stands, those could be cut, removed, and I think that would be a terrible step in the neighborhood's interest.

Harris' immediate neighbor to the east, Kevin Truan, testified as follows regarding his family's desire to see the Harris property improved and developed:

> Q. Okay.  Let me show you what's been previously identified as Exhibit Number 33 and ask you what that document is and what that document memorializes.
>
> A. This is an agreement between my wife and I and the development company that said that we would be happy with that land being developed there on these conditions.  We are still happy with that.
>
> Q. In regard to the conditions, most of the conditions address the buffer that – improvement of the buffer; is that true?

A. Yes, sir.

Q. In regard to the present buffer that is there, is the buffer that is there to your liking? Is it kept or unkept?

A. It's unkept, and there's some people living there. Some street people live in that area right now. We'd be glad to be rid of that.

Q. So is it your testimony to the Court that the current buffer has actually attracted vagrants or hobos?

A. Yes. There's several signs of them and a lot of empty drink containers.

Q. And is that – in the current condition of the buffer as it is, is that something that you would consider to be a negative factor to your home, to the safety of your home?

A. Yes, sir.

Q. What we're proposing, obviously, is also a buffer that would be along Gibbs Drive. Do you recall that?

A. Yes.

*     *     *

Q. And you've also asked that we put evergreens into what would be a new, more polished buffer?

A. Yes.

Q. And the new and better buffer would be an enhancement to your property and also something that would provide safety for your family?

A. Yes. It would be a fence and a row of trees, so it would be very clear, attractive demarcation.

Q. In regard to the fence, you want an eight-foot privacy fence made of cedar wood?

A. Yes, sir.

Q. And you wanted it tapered at the end where it would be six feet tall at the end?

A. Yes, sir.

Q. Therefore, if we do all the things that you've indicated on Exhibit 33, you would be, again, in your words, happy for the Harris lots to be developed commercially?

A. Yes, sir.

Q. In fact, you think that commercial development would actually be a plus for your house, and it would create an absolute demarcation and actually an improvement of the buffer and getting rid of any of the vagrants that are attracted to that area?

A. Yes, sir. We feel the lot is not really attractive the way it is right now.

The City of Knoxville recently developed the Gibbs Drive entrance off of Broadway, where the Harris and Whaley properties are situated, to construct two adjacent-to-one another, grassy medians separating westbound and eastbound traffic. According to Richard Smith, the new development makes it practically impossible to get a curb cut from the front Harris lot, so there could not be a driveway onto Gibbs from her lot. James Smith testified that Smith-Lindsey "absolutely would not have a curb cut to affect Gibbs Drive," and that he could "represent to this Court and these people that [he] will under no circumstances allow a curb cut on Gibbs Drive." The development plan provides for additional landscaping that would provide a separating barrier between the Harris lots and Gibbs Drive, a concession that we hold is binding on the plaintiffs under the circumstances of this case. Consequently, there is no evidence that commercially developing the Harris property would adversely impact traffic in the neighborhood.

Fourth, the neighborhood residents have acquiesced in commercial activity in violation of the "residential purposes only" covenant *on Harris' property itself* for more than thirty years. It is undisputed that Harris has rented the lots each Christmas season

25

since the 1980s for the purpose of selling Christmas trees and wreaths. *See* Exhibit 15. The exhibit shows numerous cut evergreen trees in stands along North Broadway; lights strung from temporary poles; several trucks and a camper-trailer parked on the property. A portable toilet is shown on another photograph in the record. This activity is without question purely commercial. It cannot be argued that it is "incidental" to the residential use of the property, because there is no residence on the lots and there never has been a residence there. Although it is seasonal, it is not insignificant. Moreover, it is open, obvious, and cannot be missed by anyone entering the Gibbs Drive neighborhood from North Broadway. All seven neighbors who testified stated that they were aware of the Christmas tree sales each year, and none had ever objected, or knew of any neighborhood objections. Furthermore, Whaley testified that since the Chick-fil-A opened, its employees had been parking their cars on the Harris lots:

Q. Let me hand you two photographs and ask if you can identify these, Mr. Whaley.

A. That's the new Chick-fil-A.

Q. Is that the view from your front yard or front porch?

A. This one here is my view.

Q. All right.

A. Looking across Ms. Harris's lot over to the Chick-fil-A. And this view is from across the street.

THE COURT: I'm pointing at this empty field with a bunch of cars parked in it. What is that? Is that regularly used as a parking lot?

A. No. They're so busy, they're using Ms. Harris's lot to park employees cars on. That's what these cars are.

THE COURT: Okay.

\* \* \*

Q. How long have they been parking cars on Ms. Harris's lot there?

26

A. Ever since they opened.

Q. And when was that?

A. It's been open about five months.

The Restatement (Third) of Property (Servitudes) § 7.10 provides as follows in pertinent part:

> (1) When a change has taken place since the creation of a servitude that makes it impossible as a practical matter to accomplish the purpose for which the servitude was created, a court may modify the servitude to permit the purpose to be accomplished. If modification is not practicable, or would not be effective, a court may terminate the servitude. . . .
>
> 2) If the purpose of a servitude can be accomplished, but because of changed conditions the servient estate is no longer suitable for uses permitted by the servitude, a court may modify the servitude to permit other uses under conditions designed to preserve the benefits of the original servitude.

We agree with the trial court that the purpose of the servitudes or restrictive covenants "was the creation and preservation of a residential neighborhood, and to all appearances that is exactly what the restrictions have achieved." This Court, like the trial court, is concerned with preserving the benefits of the original servitude, and preserving the residential character of the historic Gibbs Drive neighborhood. The servient estate – the Harris property – is no longer suitable for uses permitted by the servitude. The subdivision residents have for many years acquiesced in violations of the restrictions with respect to the Harris lots, *i.e.*, significant purely commercial activities, that have regularly occurred on the Harris property. We therefore hold that justice and equity require that the servitude on the Harris property be modified to remove the "residential purposes only" restriction and the requirement "that houses erected thereon shall face on [Gibbs Drive][6]," but we add a restriction that no curb cut shall be created on the property for vehicular access to Gibbs Drive. Our decree is also subject to the Truan/plaintiffs agreement as reflected in Exhibit 33.

---

[6] While it is highly unlikely that a "house" will ever be built on the Harris lots, we have cancelled this restriction and thereby rendered it unenforceable as to the Harris lots lest it be argued in the future that this restriction should be broadly construed so as to make it applicable to "structures" generally.

27

This case presents the confluence of many and varied factors, as outlined above, leading to our conclusion with respect to the lifting of the restrictions on the Harris lots. It would be a mistake to construe our holding broadly.

The Whaley property is very different. It is improved with one of the largest and, arguably, nicest houses in the neighborhood. Quite unlike the Harris lots, it thus contributes to the residential character of the subdivision as it is presently used. Moreover, Whaley purchased his property for $235,000 in 2001, in contrast to Harris, who inherited hers in 1978. Nearly all of the expert testimony proffered by Richard Smith pertained only to the Harris property. His only testimony regarding the Whaley property was his statement that "I dare say you wouldn't sell" any property fronting North Broadway "as a residential property." At the closing of trial, the trial court did not exactly credit this testimony:

> THE COURT: . . . I'm struck by two aspects of Mr. Whaley's case. One, while the brand names of the retail development that exists around that house have changed somewhat between 2001 and now, the fact is, when he bought that house, he bought it knowing that it was surrounded by commercial development. And that has not changed since 1991.
>
> MR. SEYMOUR: The mass and size of it certainly has, your Honor.
>
> THE COURT: But is it seriously arguable that the house is significantly less usable for residence purposes today than it was in 2001 when he purchased it?
>
> MR. SEYMOUR: I think so. And Mr. Whaley can use it for residential purposes.
>
> THE COURT: That's the other aspect I find incongruous, is the idea of arguing that he's living in a house that's unsuitable for residential purposes.
>
> MR. SEYMOUR: The problem is it is not marketable for residential purposes.
>
> THE COURT: Not at half a million dollars, certainly. Could it be marketable at a lesser price? Does the fact that you

don't get the highest and best use possible out of a piece of property necessarily mean that it has no use as a property?

MR. SEYMOUR: It has use for Mr. Whaley, but the proof is uncontradicted that it cannot be marketed for residential purposes.

THE COURT: The proof was he listed it for $550,000.00 and nobody bought it.

MR. SEYMOUR: The proof from Mr. Smith is that these properties are unmarketable.

THE COURT: Mr. Smith basically was talking about the Harris property.

MR. SEYMOUR: But he said any property along Broadway from Sharp's Ridge north is unmarketable as residential property. That was his testimony.

THE COURT: I suppose.

\*      \*      \*

THE COURT: Where is the inequity to Mr. Whaley?

MR. SEYMOUR: He cannot sell his house.

THE COURT: But he bought it knowing that. He bought with a Target across the street, with a Nixon's Deli on one side, and with some other development on the other side. He bought it that way.

MR. SEYMOUR: Under that reasoning, we're going to leave these restrictions on Mr. Whaley and Ms. Harris?

THE COURT: I'm not saying Ms. Harris. Ms. Harris is in a substantially different position. But Mr. Whaley bought his property knowing that it was facing Broadway, which even in 2001 was a heavily traveled arterial street upon which most residential housing had disappeared. He bought it knowing

29

that. If you're going to appeal to equity, other than the fact that he could make more money selling it for commercial uses, where is the inequity to him?

MR. SEYMOUR: He can't even recoup his money out of the house.

THE COURT: We've had no evidence on that. And if you are telling me he put that house on the market for $235,000.00 it wouldn't be bought, I'd be pretty tempted, other than the fact that I'm sitting here hearing this case, to buy it myself.

As is shown by the above, the trial court recognized the differences between the Whaley and Harris properties. We affirm the decision of the trial court refusing to eliminate or modify the subject restrictive covenant on Whaley's property.

V.

The judgment of the trial court with respect to the Harris property is reversed with restrictions added. The judgment of the trial court with respect to the property of Mr. Whaley is affirmed. Costs on appeal are assessed one-half to the appellees, Amanda B. Aldmon, et al., and one-half to the appellant, Robert A. Whaley. The case is remanded to the trial court for the entry of a judgment there consistent with this opinion.

_____
CHARLES D. SUSANO, JR., CHIEF JUDGE

30