IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs February 2, 2018

## PATRICK DURKIN v. MTOWN CONSTRUCTION, LLC

**Direct Appeal from the Circuit Court for Shelby County**
**No. CT-004623-16      Rhynette N. Hurd, Judge**

_____

**No. W2017-01269-COA-R3-CV**
_____

This appeal involves a homeowner's lawsuit against a construction company for breach of contract and negligence. After a bench trial, the trial court entered judgment for the homeowner for $135,383.93 and denied a counterclaim filed by the construction company for the balance of the contract price. The construction company appeals, arguing that the trial court erred in its calculation of damages and in denying the counterclaim. We affirm in part, reverse in part, and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in part, Reversed in part, and Remanded**

BRANDON O. GIBSON, J., delivered the opinion of the court, in which CHARLES D. SUSANO and RICHARD H. DINKINS, JJ., joined.

Christopher M. Myatt, Memphis, Tennessee, for the appellant, MTown Construction, LLC.

Lewis Clayton Culpepper, III, Memphis, Tennessee, for the appellee, Patrick Durkin.

## OPINION

### I.   FACTS & PROCEDURAL HISTORY

Patrick Durkin purchased a home in a historic neighborhood in Memphis in 2015. In 2016, Mr. Durkin entered into a written contract with MTown Construction, LLC, for the replacement of his roof. The work began on August 25, 2016. After workers removed about three quarters of the existing shingles, rain began falling. The rain quickly developed into a thunderstorm and "a complete downpour." MTown workers attempted to cover the exposed roof with tarps, but the tarps contained holes and did not adequately protect the home. Rain entered the attic and then began seeping into the

living area.  Mr. Durkin used pots, pans, boxes, drawers, and trash cans in an attempt to contain the water from the numerous leaks.  However, rain entered every room in Mr. Durkin's home.  Water filled the light fixtures and poured out of ventilation registers in the ceilings.  Water continued flooding the home for over an hour.

As the MTown workers took cover from the rain on Mr. Durkin's porch, Mr. Durkin called his contact at MTown to report the situation.  MTown's owner, Michael Inglasbe, and two other individuals arrived shortly thereafter and surveyed the damage.  Eventually, someone brought new tarps for the roof, but the damage was done by that point.  MTown's crews completed the roof work over the next two days but did nothing to address the water intrusion affecting the inside of the home.  During that time, the plaster ceilings inside the home began to collapse and fall to the floor.

Three days after the flooding occurred, MTown's owner, Mr. Ingalsbe, finally returned Mr. Durkin's phone calls and returned to the home.  Mr. Ingalsbe indicated that he had fans, moisture meters, and dehumidifiers and that his crews would soon begin "dropping ceilings."  Mr. Inglasbe said he would send a storage pod to the property and instructed Mr. Durkin to move all of his belongings into the pod prior to the reconstruction work.  In the days that followed, Mr. Inglasbe and Mr. Durkin discussed proposals for the work, and Mr. Durkin moved out of the home.  However, after Mr. Ingalsbe's crew returned and saw the damage, Mr. Inglasbe contacted Mr. Durkin and told him that he had decided to proceed through his insurance company because his crew believed the home was "a complete demo."

MTown's insurer sent a claims representative to inspect the damage on September 11, 2016, two weeks after the rain event.  He prepared an estimate of damages totaling $24,678.84.  Mr. Durkin believed this was woefully insufficient and consulted with general contractors to obtain independent estimates.  A general contractor and project manager from Capital Construction concluded that $33,455.53 in additional work needed to be performed besides that listed in the estimate from the claims representative.  Mr. Durkin also obtained an estimate from ServiceMaster by Cornerstone, a remediation company, for $60,791.75 in environmental remediation work that was deemed necessary due to the mildew and hazardous waste concerns in the home.  Mr. Durkin also discovered numerous problems with the roof that MTown ultimately installed, including nails piercing the HVAC system in the attic, exposed nails in the soffits around the porch, and rotten wood that was not removed prior to the installation of the roof.  Mr. Durkin obtained an estimate of $7,000 to repair the problems with the roof that MTown installed.

On November 14, 2016, Mr. Durkin filed this lawsuit against MTown, asserting breach of contract and negligence. He sought to recover damages for construction and remediation costs that would be necessary to address the water damage and repair of the defective roof, displacement costs due to the home being uninhabitable, and other incidental damages. MTown filed an answer and a counterclaim, in which it sought to recover the unpaid contract price for the roof under theories of breach of contract and unjust enrichment.

A two-day bench trial was held in May 2017. The trial court heard testimony from the claims representative who provided the original estimate to Mr. Durkin, the project manager from Capital Construction who prepared the additional estimate, the licensed general contractor from Capital Construction, the operations manager from ServiceMaster by Cornerstore, and Mr. Durkin. MTown also presented testimony from an expert in the field of meteorology, who testified about the sudden nature of the thunderstorm. After two additional post-trial hearings, the trial court ultimately entered an order ruling in favor of Mr. Durkin. The trial court found that MTown was liable under both theories of liability – breach of contract and negligence. The court found that MTown was not prepared with appropriate supplies in the event of rain and that Mr. Durkin did what he could to mitigate his damages, relying in part on the representation of MTown's owner that he would address the situation. The trial court awarded Mr. Durkin a sum for displacement costs and storage fees he incurred for the pod, in addition to $7,000 for the repairs necessary to fix the roof that MTown installed. On appeal, MTown does not challenge the findings of liability or the trial court's damage awards on these matters.

Regarding the water damage, the trial court acknowledged that Mr. Durkin had presented evidence regarding the cost to repair the damage, but the trial court elected to award damages based on the diminished value of the home instead. Using a method that we will explain in more detail below, the trial court ultimately concluded that the diminution in the value of the home was $118,500, and it awarded that sum to Mr. Durkin rather than the cost to repair the damage. The trial court denied MTown's counterclaims for breach of contract and unjust enrichment, reasoning that MTown was the first to breach the contract and that it caused additional damages necessitating further repairs. MTown timely filed a notice of appeal.

## II. ISSUES PRESENTED

MTown lists the following issues for review on appeal:

1. Whether the trial court improperly took judicial notice of a disputed fact when awarding damages for the diminution in value to Durkin's real property;

2. Whether the proper measure of damages to Durkin's real property is zero;

3. Whether Durkin's proof on costs of remediation was both speculative and duplicative; and

4. Whether MTown Construction is entitled to compensation for its installation of Durkin's roof under unjust enrichment.

For the following reasons, we affirm in part, reverse in part, and remand for further proceedings.

## III. DISCUSSION

Before addressing the parties' specific arguments on appeal, it is helpful to examine the appropriate measure of damages in a case of this type. We review a trial court's choice of the proper measure of damages de novo as a question of law. *GSB Contractors, Inc. v. Hess*, 179 S.W.3d 535, 541 (Tenn. Ct. App. 2005).

The proper measure of damages for injury to real property is the lesser of either (1) the cost of repairing the injury, or (2) the difference in value of the premises immediately prior to and immediately after the injury. *Simmons v. City of Murfreesboro*, No. M2008-00868-COA-R3-CV, 2009 WL 4723369, at *5 (Tenn. Ct. App. Dec. 9, 2009) (citing *Fuller v. Orkin Exterminating Co., Inc.*, 545 S.W.2d 103, 108-09 (Tenn. Ct. App. 1975)).[1] *Generally*, however, the measure of damages will be the cost of repair *unless* the repairs are not feasible or the cost of repair is disproportionate to the diminution in value. *GSB Contractors*, 179 S.W.3d at 543 (citing *Radant v. Earwood*, No. 02A01-9802-CV-00029, 1999 WL 418339, at *8 (Tenn. Ct. App. June 22, 1999)); *see also Bowen v. Rasnake*, No. E2009-00353-COA-R3-CV, 2009 WL 5083467, at *6 (Tenn. Ct.

---

[1]The measure of damages for injury to real property is the same whether based on a negligence or breach of contract theory. *Simmons*, 2009 4723369, at *5.

4

App. Dec. 28, 2009) ("reasonable repair cost is generally the preferred measure"); *Coleman v. Daystar Energy, Inc.*, No. E2007-00226-COA-R3-CV, 2007 WL 4117776, at *2 (Tenn. Ct. App. Nov. 19, 2007) (describing reasonable repair cost as "the general rule"). "'This is especially true when the structure involved is the owner's home.'" *GSB Contractors*, 179 S.W.3d at 543 (quoting *Nutzell v. Godwin*, No. 33, 1989 WL 76306, at *2 (Tenn. Ct. App. July 13, 1989)). Still, in the event that the cost of repair is disproportionate when compared to the difference in value of the structure, the diminution in value method may be used as the measure of damages. *Id.*

Notably, however, in a case involving real property damage, "the plaintiff does not have the burden of offering alternative measures of damages," and the burden is on the defendant if he or she seeks to argue that the measure of damages advanced by the plaintiff is unreasonable. *Watts v. Lovett*, No. E2004-0783-COA-R3-CV, 2005 WL 1105167, at *3 (Tenn. Ct. App. May 10, 2005). For instance, in *Conatser v. Ball*, No. M1999-00583-COA-R3-CV, 2001 WL 873457, at *3 (Tenn. Ct. App. Aug. 3, 2001), the defendant argued that the measure of damages to real property must be "calculated by a two-pronged test" and that it was the plaintiffs' burden to prove both prongs -- the cost of repair and diminution in value. *Id.* at *11. In other words, the defendant took the position that "the [plaintiffs] were required to prove both amounts so that the 'whichever is less' comparison can be made." *Id.* at *8. We rejected that argument and emphasized that the plaintiffs did not have the burden of offering an alternative measure of damages. *Id.* at *12. Instead, "'[t]he burden was on the defendant to show that the cost of repairs [was] unreasonable when compared to the diminution in value due to the defects and omissions.'" *Id.* (quoting *Nutzell*, 1989 WL 76306, at *1). Simply put, the plaintiffs were not required to prove the diminution in value of their land; the defendant was required to present such proof if he wanted the court to apply that measure of damages. *Id.*

Clearly, then, under Tennessee law, a "homeowner may prevail against a [defendant] and recover the cost of repairs without proving a diminution of value." *Bowen*, 2009 WL 5083467, at *6. For an award of damages other than the cost of repair, it is incumbent on the defendant to offer proof showing diminution in value. *Consulting & Fin. Servs., Inc. v. Friedmann*, No. M2011-00093-COA-R3-CV, 2012 WL 1390621, at *6 (Tenn. Ct. App. Apr. 19, 2012).

We now apply these principles to the facts of this case. At trial, Mr. Durkin presented extensive testimony from several witnesses regarding the estimated costs to repair the damage to his house. Aside from Mr. Durkin's own testimony, the court heard testimony from the claims representative for MTown's insurer who prepared the initial

estimate, a general contractor and a project manager from the construction company that provided the supplemental estimate, and the operations manager of a remediation company. In order for the "diminution in value" measure of damages to apply, in the alternative, MTown had the burden of showing the diminution in value of the property. *GSB Contractors*, 179 S.W.3d at 543. MTown did not call any witnesses to testify regarding the valuation of the structure, but MTown claims that it sufficiently proved the diminution in value through the testimony of Mr. Durkin.

The testimony regarding valuation was very limited. At the very beginning of the two-day trial, Mr. Durkin was asked, "In your estimation as the homeowner, what's your home worth now?" He responded, "I believe it's $155,000," and stated that he had recently received a document from the Shelby County Assessor indicating that value.[2] After testifying at length about the extensive damage to the home, he was asked the following questions about the value of his home during cross-examination:

Q. We established that this rain event happened on August 25th, the day before obviously would be August 24th. And what was the fair market value of your residence on August 24th?

A. I believe it was $144,000.

Q. What was the fair market value of the residence on the night after the rain event?

A. I believe it was still roughly $144,000 *as of the City*.

(Emphasis added.) No other opinions were offered on valuation. Relying on this testimony, MTown contends that the value of Mr. Durkin's home was the same "after the rain" as it was before the rain. As such, MTown argues that the proper measure of damages in this case is the diminution in value method, resulting in zero damages, because zero is less than the cost of repair claimed by Mr. Durkin, totaling $118,926.12.

---

[2]Mr. Durkin also mentioned that he bought the home in 2015 for $65,000. No explanation was provided for the discrepancy between the purchase price and the assessed value or his opinion as to its value. Mr. Durkin only mentioned that he had lived in the home as a renter since 2009.

At the conclusion of the testimony, the trial judge candidly admitted that she was "having some difficulty" with the appropriate measure of damages. She asked the attorneys to submit caselaw as to whether the measure of damages should be the cost of repair or the diminution in value. At a subsequent hearing, the trial judge stated her opinion that "the cost of repair was higher than what this Court believes is the diminution in value." However, the judge indicated that she encountered a "problem" when actually calculating the diminution in value because of the limited testimony presented. She noted that Mr. Durkin was the only witness to testify with an opinion as to valuation, and he was only asked a very limited question. Specifically, he was asked about the value of the home "the night after the rain." The trial judge recognized that the extent of the damage was unclear "the day after" and that the real "consequence of this injury" occurred in the days that followed when MTown's owner assured Mr. Durkin that the damage would be addressed, but it was not. She concluded that "[t]he real injury" occurred from the fact that MTown made no effort to remedy the water damage in a timely manner. The trial judge noted the testimony of the microbial remediation expert who testified that water damage that is untreated or unaddressed for over 72 hours is classified as "Category 3" water requiring more extensive remediation efforts. Accordingly, the trial judge concluded that Mr. Durkin's testimony as to the value of the home the day after the rain was "not relevant."

After disregarding Mr. Durkin's "night after" testimony, the trial judge found no other basis for making a comparison of the value of the home immediately before and immediately after the event in order to determine the diminution in value. However, rather than awarding damages based on the cost to repair, the trial judge devised what she described as a "creative" approach to determining the diminution in value in the absence of relevant evidence from trial. The trial judge referenced Mr. Durkin's testimony that the home was valued at $144,000 before the rain according to the tax assessor but said she would "take[] judicial notice" that the sum of $144,000 would include not only the value of the structure before the rain but also the value of the land itself. The trial judge then directed the parties' attorneys to find additional information from the property assessor about the "land value" of the property in order to determine the actual value of the structure itself prior to the rain. Once the attorneys found that information, they were to report back to the trial judge for a determination on diminution in value. The trial judge stated that she would also "take[] judicial notice that no one would buy the house" with the microbial concern, and therefore, the value of the structure itself after the damage would be zero. In summary, the trial judge explained, she intended to calculate the damage award based on diminution in value using a "before" valuation of $144,000 minus the value of the land itself (as determined by the tax assessor records) and using an "after" valuation of zero.

At the next hearing, MTown's attorney objected to the trial court's decision to take judicial notice of the value of the home 72 hours after the rain event. The trial judge maintained that she was justified in placing a value of zero on the home based on the trial testimony about the damage and "the Court's knowledge of what fair-market value was." Mr. Durkin's attorney reported that the tax assessor's office valued the land at $25,500 in 2016. By "plugging that number in" the aforementioned formula ($144,000 – $25,500), he calculated the diminution in value of the structure at $118,500. The trial court subsequently entered a written order awarding Mr. Durkin $118,500 for the damage to the residence resulting from the water damage, taking judicial notice that the value of the structure itself after the rain event was zero. The order did not include any finding with a value or total of the "cost to repair" evidence presented by Mr. Durkin. The order simply states, "Because the cost to repair damages presented by Plaintiff were disproportionate to the fair market value of the property of $144,000, which includes the value of the land and structure, the Court is reluctant to award the full cost of repairs as damages."

On appeal, MTown argues that the trial court improperly took judicial notice of a disputed fact when awarding damages based on the diminution in value of the property. MTown argues that the "only competent proof" of value after the damage came from Mr. Durkin himself, as he testified that the "value of the residence on the night after the rain event . . . was still roughly $144,000 as of the City," and the value according to the tax assessor at the time of trial was $155,000. Because of this testimony, MTown argues that the damage to Mr. Durkin's real property must be assessed at zero because zero is less than the claimed costs to repair totaling $118,926.12.

We agree that the trial court improperly took judicial notice of the value of the home after the damage in order to calculate the diminution in value of the property. "[P]rior to a court's consideration of awarding damages based on diminution in value, as opposed to the cost of repair, proof must be offered on both the cost of repair and the diminution in value." *Wilkes v. Shaw Enters., LLC*, No. M2006-01014-COA-R3-CV, 2008 WL 695882, at *10 (Tenn. Ct. App. Mar. 14, 2008). "Otherwise, a court is left with no legal basis upon which to grant an award of the diminution in value." *Id.* The diminution in value measure "is applicable only when proof has been offered on both" of the two options for measuring damages. *GSB Contractors*, 179 S.W.3d at 543. In order to meet its burden of proving a *diminution* in value, the defendant must produce sufficient proof of value to provide a basis for comparison. *Buttrey v. Holloway's, Inc.*, No. M2011-01335-COA-R3-CV, 2012 WL 6451802, at *8 (Tenn. Ct. App. Dec. 12, 2012); *see, e.g.*, *Bowen*, 2009 WL 5083467, at *6 (finding "little meaning" in evidence of an asking price without comparison proof of what the market value would have been had the home not been defective); *Simmons*, 2009 WL 4723369, at *5-6 (finding no proof of diminution in value where the record contained a valuation before the event but not

after). "If the defendant fails to meet its burden to show the cost of repairs is unreasonable when compared with the diminution in value, the trial court must base its measure of damages on the cost of repairs." *Buttrey*, 2012 WL 6451802, at *8; *see also Wilkes*, 2011 WL 1679042, at *4 (explaining that if the defendant fails to introduce "credible proof of the building's diminution in value, the trial court must base its measure of damages on the cost of repairs").

We recognize that an owner of property is competent to testify as to the value of such property. *Ray v. Sadler Homes, Inc.*, No. M2011-01605-COA-R3-CV, 2012 WL 2150752, at *4 (Tenn. Ct. App. June 13, 2012). However, in this case, the trial judge was justified in discounting or discrediting Mr. Durkin's testimony that the "value of the residence on the night after the rain event . . . was still roughly $144,000 as of the City," and $155,000 at the time of trial. Mr. Durkin spent a great deal of time discussing extensive damage to every room in his house, and it appears that he simply based this valuation opinion on "the City" valuation according to the tax assessor's office. Furthermore, as the trial judge aptly noted, the full extent of the damage was neither known nor realized "on the night after the rain event." Finding no *reliable* relevant evidence of the value of the property after the damage, the trial court should have found that MTown failed to carry its burden of proving an alternative measure of damages and calculated the measure of damages based on the cost of repair rather than seeking out additional valuation evidence. *See, e.g.*, *Bowley v. Lane*, No. E2012-00134-COA-R3-CV, 2013 WL 4680222, at *10-11 (Tenn. Ct. App. Aug. 29, 2013) (explaining that the fact-finder was free to credit or discredit the testimony with regard to diminution in value where the particular testimony "stretche[d] credibility"); *Friedmann*, 2012 WL 1390621, at *6 (concluding that a realtor's testimony about a listing price was not sufficient probative evidence of diminution in value); *Wilkes*, 2008 WL 695882, at *11 (finding "no credible evidence" of diminution in value where the only evidence was the defendant's own testimony that the diminution in value was zero because the house with its defects was worth the same amount the homeowners paid for it).

Still, we respectfully decline Mr. Durkin's invitation to award him $118,926.12 in damages based on the cost to repair evidence he presented to the trial court. As noted above, the trial court made no finding as to the amount that it would have awarded if it had utilized the cost of repair analysis. The proper measure of damages is the *reasonable* cost of repair. *Conatser*, 2001 WL 873457, at *12. At some points during the post-trial hearings, the trial judge referenced the total cost of repair that Mr. Durkin sought to recover − $118,926.12 − when discussing the parties' comparisons with the calculation on diminution in value. However, at other points, the trial judge expressed some hesitation about awarding the total amount sought. Notably, at the conclusion of the testimony, the trial judge said, "I'm not sure that the experts were convincing that the entire amounts

9

suggested were necessary." Later, the trial judge stated that it was not necessary to address MTown's argument that some of the repair costs were duplicative because the cost of repair would exceed the diminution in value either way.

The amount of damages to be awarded in a given case is essentially a fact question. *GSB Contractors, Inc.*, 179 S.W.3d at 541. Given the various opinions in this case as to the amount of work that was necessary, credibility determinations would be particularly important. The trial court was not required to accept the estimates in the record wholesale simply because they were the only ones before the court. *See Harper v. Dixon*, No. E2015-00411-COA-R3-CV, 2016 WL 2954311, at *5 (Tenn. Ct. App. May 16, 2016) (*no perm. app. filed*) (explaining that the trial judge is not compelled to unequivocally accept expert opinions or estimates when deciding the cost of repair). Normally, after a bench trial, we review the *amount* of damages awarded by the court with a presumption of correctness and alter it only if the evidence preponderates against the amount awarded. *Webster v. Estate of Dorris*, No. M2014-02230-COA-R3-CV, 2016 WL 502009, at *8 (Tenn. Ct. App. Feb. 4, 2016) (*no perm. app. filed*). In the absence of any ruling by the trial court in this case as to the reasonable cost of repair, we remand for the trial court to make the necessary factual findings and an award of damages based on the reasonable cost of repair.

Finally, we consider MTown's issue on appeal regarding whether it was entitled to compensation for installing the roof under the theory of unjust enrichment. MTown filed its counterclaim against Mr. Durkin seeking to recover under two theories -- breach of contract and unjust enrichment. (Before the trial court, MTown sometimes characterized its unjust enrichment claim as one for quantum meruit.) The trial court found that MTown breached the contract first, causing additional damages to the roof and necessitating further repairs, and therefore, Mr. Durkin had no obligation to pay for the roof work. As a result, the trial court denied MTown's claims for breach of contract and unjust enrichment. On appeal, MTown does not present any argument regarding a breach of contract theory. Its brief does not analyze or discuss the trial court's finding that MTown was the first to materially breach the contract. In fact, MTown concedes the propriety of the trial court's damage award of $16,883.93 "for loss of use, the storage container, *and repairs to the roof*." (Emphasis added.) Thus, we will not review on appeal the trial court's denial of MTown's counterclaim *for breach of contract*. We will only consider his issue on appeal regarding *unjust enrichment*.

The precise issue presented by MTown on appeal is "whether MTown Construction is entitled to compensation for its installation of Durkin's roof under unjust enrichment." MTown argues that this Court should award it $10,419.42, representing the

price stated in the original roofing contract, under the theory of unjust enrichment. "Actions brought upon theories of unjust enrichment, quasi contract, contracts implied in law, and quantum meruit are essentially the same." *Paschall's, Inc. v. Dozier*, 407 S.W.2d 150, 154 (Tenn. 1966). Courts frequently employ these terms interchangeably to describe the class of implied obligations where the law will impose a contractual relationship between parties, regardless of their assent thereto, on the basis of justice and equity. *Id.*

It is important to note, however, that an equitable theory such as quantum meruit "is a separate and distinguishable cause of action from breach of contract." *Nations Rent of Tenn., Inc. v. Lange*, No. M2001-02368-COA-R3-CV, 2002 WL 31467882, at *2 (Tenn. Ct. App. Nov. 6, 2002).

> 'A quantum meruit action is an equitable substitute for a contract claim pursuant to which a party may recover the reasonable value of goods and services provided to another if the following circumstances are shown:
>
> (1) *There is no existing, enforceable contract between the parties covering the same subject matter*;
>
> (2) The party seeking recovery proves that it provided valuable goods or services;
>
> (3) The party to be charged received the goods or services;
>
> (4) The circumstances indicate that the parties to the transaction should have reasonably understood that the person providing the goods or services expected to be compensated; and
>
> (5) The circumstances demonstrate that it would be unjust for a party to retain the goods or services without payment.'

*Doe v. HCA Health Servs. of Tennessee, Inc.*, 46 S.W.3d 191, 197-98 (Tenn. 2001) (quoting *Swafford v. Harris*, 967 S.W.2d 319, 324 (Tenn. 1998)) (emphasis added). Likewise, "[a] claim for unjust enrichment in Tennessee rests, in part, on the fact that the parties did *not* have an enforceable contract." *Simpson v. Bicentennial Volunteers, Inc.*, No. 01A01-9809-CV-00493, 1999 WL 430497, at *2 (Tenn. Ct. App. June 29, 1999). "Courts may impose a contractual obligation under an unjust enrichment theory if there is no contract between the parties or the contract has become unenforceable or invalid, and the defendant will be unjustly enriched unless the court imposes an obligation." *In re Estate of Ross*, No. M2013-02218-COA-R3-CV, 2014 WL 2999576, at *3 (Tenn. Ct. App. June 30, 2014). However, "'an implied contract or quasi-contract will not be

imposed in circumstances where an express contract or agreement exists.'" *Scandlyn v. McDill Columbus Corp.*, 895 S.W.2d 342, 349 (Tenn. Ct. App. 1994) (quoting *Fletcher Realty, Inc. v. Hayslope Props*, 712 S.W.2d 478, 481 (Tenn. Ct. App. 1986)). "No matter what terms are used to describe the purely equitable remedy provided by quasi contract implied in law, quantum meruit and unjust enrichment, this equitable remedy is generally not available if a valid and enforceable written contract governs the subject matter in issue between the parties." *Ridgelake Apartments v. Harpeth Valley Utils. Dist. of Davidson & Williamson Cntys.*, No. M2003-02485-COA-R3-CV, 2005 WL 831594, at *9 (Tenn. Ct. App. Apr. 8, 2005).

Here, the parties have an existing, enforceable contract covering the subject matter of the roof work. Analyzing the parties' competing claims for breach of contract, the trial court found that Mr. Durkin was entitled to recover for breach of contract and that MTown was not entitled to recover for breach of contract due to the fact that it committed the first material breach. Mr. Durkin cannot bypass these holdings on the breach of contract claims by attempting to recover under the theory of unjust enrichment. *See Metro. Gov't of Nashville & Davidson Cnty. v. Cigna Healthcare of Tenn., Inc.*, 195 S.W.3d 28, 33 (Tenn. Ct. App. 2005) (holding that a party was precluded from recovering damages under the equitable theory of unjust enrichment because of the existence of a contract); *Ridgelake Apartments*, 2005 WL 831594, at *8 (rejecting an unjust enrichment claim asserted as an alternative to a breach of contract claim due the existence of an agreement); *Scandlyn*, 895 S.W.2d at 349 (explaining that a party could not "abandon an express contract and seek recovery in quantum meruit or under an implied contract theory"). We affirm the denial of MTown's counterclaim for unjust enrichment.

## IV. CONCLUSION

For the aforementioned reasons, the decision of the circuit court is hereby affirmed in part, reversed in part, and remanded for further proceedings. Any remaining issues are pretermitted. Costs of this appeal are taxed one-half to the appellee, Patrick Durkin, and one-half to the appellant, MTown Construction, LLC, and its surety, for which execution may issue if necessary.

_____
BRANDON O. GIBSON, JUDGE