**W.E. SCANDLYN, et ux., et al., Plaintiffs/Appellees,**

v.

**McDILL COLUMBUS CORPORATION and Lakes Resort Corporation, Defendants/Appellants.**

Court of Appeals of Tennessee, Eastern Section, at Knoxville.

Nov. 8, 1994.

Permission to Rehear Denied by Supreme Court Feb. 27, 1995.

 

Lewis S. Howard, Jr., Greg D. Meadows, Long, Ragsdale & Waters, P.C., Knoxville, for plaintiffs/appellees.

Steven C. Douglas, Sabine & Douglas, P.C., Crossville, for defendants/appellants.

## OPINION

LEWIS, Judge.

Plaintiffs, individually and as representatives of individuals owning lots in the Lakes Resort Campground located in Cumberland County, Tennessee (the Resort), filed their complaint and amended complaint in the Circuit Court for Cumberland County against defendants McDill Columbus Corporation (McDill) and Lakes Resort Corporation (Lakes Resort). Plaintiffs sought in part: certification of their suit as a class action; compensatory damages for sums paid to defendants in excess of the actual costs of essential utilities provided by defendants to plaintiffs and for the alleged interference with plaintiffs' quiet enjoyment of their property; treble damages and attorney's fees; and punitive damages.

The trial court certified the suit as a class action. Thereafter, defendants filed their respective answers, and defendant Lakes Resort filed a counter-complaint.

Following a bench trial, the trial court entered judgment in favor of the plaintiffs in the sum of $100,542.50 and for discretionary costs in the amount of $1,162.00, dismissed the counter-claim of defendant Lakes Resort, and granted plaintiffs exclusive use of the sixty-acre lake located within the Resort.

The defendants have timely filed their appeal.

The pertinent facts are as follows. Plaintiffs are fee simple owners of lots which are located in the Lakes Resort Campground, Cumberland County, Tennessee. The Resort was established over twenty-five years ago and since its establishment has been owned by several different developers and has changed names numerous times. The developers supply the electricity, water, sewer services, general maintenance, security, and facilities, which include swimming pools,

a softball field, a tennis court, an outdoor pavilion, and other recreational facilities.

All of the developers who have owned the Resort, have owned all of the property, except for lots which have been purchased in fee simple by individuals. Most individuals who have purchased the lots have placed trailers on their lots for camping purposes. In order to camp at the Resort, however, it is not necessary to purchase a lot. Campers may also be "members" of the Resort. Plaintiffs in this case are lot owners and have sued defendants McDill and Lakes Resort individually and on behalf of similarly situated lot owners.

The original developer of the Resort did not set forth in writing any procedures concerning the Resort nor did it record any restrictive covenants. However, in 1981 certain restrictive covenants were recorded in the Cumberland County Register's Office, which confined access to the sixty acre lake located in the Resort "to property owners of Campout U.S.A., Inc. as well as Campout Inc." On 24 September 1983, a Correction of Restrictions instrument was recorded in the Cumberland County Register's Office, the purpose of which was to modify the restrictive covenants to allow membership owners access to the sixty acre lake. Plaintiffs, relying on the original restrictive covenants, sought an order permanently enjoining defendants from utilizing and/or allowing other persons to utilize the lake and for recovery from defendants for the alleged interference with the quiet enjoyment of their property.

From 6 November 1989 through 14 August 1992, McDill owned the Resort. Defendant Lakes Resort was incorporated to operate the resort. McDill no longer owns the Resort; it sold the Resort to Thousand Adventures of Tennessee, Inc., a Tennessee Corporation, on 18 August 1992.

Prior to November 1989, The Lakes Corporation, McDill's predecessor, owned the Resort. The Lakes Corporation collected a monthly fee from the plaintiffs in exchange for providing the services previously noted. Plaintiffs paid The Lakes Corporation thirty-six dollars ($36.00) per month for these services.

In November 1989, McDill acquired the Resort through foreclosure proceedings which had been instituted against The Lakes Corporation. Subsequent to acquiring the Resort, McDill sent a letter to all of the property owners and members of the membership camping area located within the Resort. In the letter, McDill advised those persons of the acquisition of the Resort and that they should continue to send maintenance fees in the amount of $36.00 per month, the same amount collected by its predecessor.

In a letter dated 18 December 1989, McDill advised the plaintiffs that it was closing the Resort and terminating all services, including utilities, because too few people had remitted the maintenance fees. The letter stated that McDill's decision to close the Resort was in accordance with Tennessee's Membership Camping Act, specifically Tennessee Code Annotated section 47–18–402(9)(c). In March 1990, McDill advised the property owners that it was re-opening the Resort as of 1 April 1990 and that maintenance fees had been increased from $36.00 per month to $62.00 per month. McDill further advised the property owners that it was assessing each owner $225.00 to cover the cost of deferred maintenance and capital improvements made to the Resort while it was closed. Numerous property owners objected to the increased maintenance fees and assessment and refused to pay, which resulted in McDill terminating utility services to those persons.

On 10 December 1991, plaintiffs filed this suit against McDill and Lakes Resort. The case was tried before the trial court without the intervention of a jury.

I.

The first issue is: Whether the trial court erred in finding a contractual relationship between the plaintiffs and defendants with regard to the payment of maintenance fees in exchange for utilities and services, and whether there was a breach of such contract by the defendants.

On 22 November 1989, defendants sent a letter to plaintiffs stating that the maintenance fees in the amount of $36.00 per month

should be sent to defendant McDill, effective November 1989. Some plaintiffs paid the maintenance fees to McDill in response to this letter; other plaintiffs had prepaid maintenance fees for 1989 to the previous owner and therefore did not respond to McDill's letter. Plaintiffs insist that as a result of the offer of defendants to the plaintiffs to accept $36.00 per month for maintenance fees, a contract was created that was binding upon defendants McDill and Lakes Resort.

■ When one person is requested by another to make a promise, and the first person complies by his or her words or actions, and there is a valuable consideration, a completed contract is created. *See Arcon Corp. v. Liberty Mut. Ins. Co.*, 591 F.Supp. 15, 19 (M.D.Tenn.1983) (citing *Dark Tabacco Growers' Co-Op. Ass'n v. Mason*, 150 Tenn. 228, 263 S.W. 60, 67 (1924)). "[T]he existence of a contract, the meeting of the minds, the intention to assume an obligation, and the understanding are to be determined ... not alone from the words used, but also the situation, acts, and the conduct of the parties, and the attendant circumstances." *Apco Amusement Co. v. Wilkins Family Rests. of America*, 673 S.W.2d 523, 527 (Tenn.App.1984) (quoting 17 Am.Jur.2d *Contracts* § 1 (1964)). In *Apco* the court stated:

This same approach, examining the conduct of the parties, was adopted by this court in the case of *Bailey v. Brister*, 49 Tenn.App. 191, 353 S.W.2d 564 (1961). In determining whether certain correspondence, in the form of letters sent between the parties, constituted a contract or was merely a part of the negotiations leading to a potential contract, we stated that "[t]he practical interpretation of a contract by the parties thereto is entitled to great, if not controlling influence, and will be adopted by the courts." *Id.* [353 S.W.2d] at 568. The court explained this rule of interpretation, quoting from *Williston on Contracts*, Sec. 623, as follows: "The interpretation given by the parties themselves to the contract as shown by their acts will be adopted by the court, and to this end not only acts but the declarations of the parties may be considered." *Bailey*, 353 S.W.2d at 568. In the present case, re-

viewing the conduct of the parties, we believe the parties acted upon the letter in such a way as to suggest that they believed a binding agreement had been reached. As the chancellor noted, both parties proceeded with fulfilling obligations set forth in the document....

*Apco*, 673 S.W.2d at 527–28.

■ We are of the opinion that the evidence in this case proves the parties believed a binding agreement had been reached. The trial court noted that both parties proceeded to fulfill obligations set forth in the November 1989 letter. When the defendants offered to provide maintenance services at the rate of $36.00 per month, a number of the plaintiffs accepted the offer by paying the maintenance fees to defendant McDill in November and December 1989. Numerous other plaintiffs had prepaid the maintenance fees for 1989 to the previous owner and therefore did not respond to defendant's letter. These plaintiffs acquiesced to the terms of the contract by accepting the services, and McDill proceeded to fulfill its obligations to provide utilities and maintenance as set forth in the November 1989 letter. Therefore, the November 1989 letter constituted a binding agreement between the parties, and an express contract existed.

■ We agree with the trial court that assuming arguendo that an express contract was not created, an implied contract existed between plaintiffs and defendants. "Contracts are created by acts of the parties and may be oral or written, express, implied in fact, or implied in law." *House v. Tenn Mark Telecommunications, Inc.*, No. 87–256–II, 1988 WL 123014, at *3 (Tenn.App. 1988). "In Tennessee, an express contract is created by the parties' actual assent to mutually acceptable terms expressed in words or other suitable mode. Conversely, a contract implied in law is imposed by operation of law, without regard to the assent of the parties, on grounds of reason and justice." *Continental Motel Brokers, Inc. v. Blankenship*, 739 F.2d 226, 232 (6th Cir.1984) (citations omitted). Courts are directed to look to the conduct of the parties in light of all the circumstances to determine whether an im-

plied contract exists. One Tennessee court has explained as follows:

In Tennessee,

any conduct from which a reasonable person in the offeree's position would be justified in inferring a promise in return for the requested act, amounts to an offer, and that such a request might be implied when the facts and circumstances are such that the person receiving the benefit of such work or services know, or reasonably should have known, that the person doing the work expected to be compensated.

*Cummins v. Brodie,* 667 S.W.2d 759, 764 (Tenn.App.1983) (quoting *In re Estate of Holding,* 61 Tenn.App. 654, 663–64, 457 S.W.2d 545, 549 (1969)). Assuming arguendo that an express contract did not exist, the evidence is clear from the conduct of the parties that an implied contract existed, that defendants were obligated to provide maintenance services, and that plaintiffs were obligated to pay for such services.

We think the trial court properly found a contractual relationship between plaintiffs and defendants with regard to payments of maintenance fees in exchange for utilities and services.

■ However, after contracting with the plaintiffs, the defendants closed the Resort from December 1989 until April 1990. Thereafter, defendants demanded the owners pay $62.00 per month maintenance fees instead of the $36.00 fee, which had previously been required. Defendants also assessed each lot owner the sum of $225.00 for "deferred operating expenses" which were incurred while the Resort was closed.

The defendants failed to provide the services that they had contractually obligated to provide, when they began terminating the supply of electricity and water to property owners who disputed the legality of the increased fees and assessment. The trial court properly found that the defendants breached their agreement with plaintiffs.

## II.

■ Defendants next contend that there was no "basis in fact or law for the trial court to have entered judgment against McDill on any of the theories pled by the plaintiffs." Defendants further contend the court did so on the basis that it found McDill and Lakes Resort to be the same entity "for purposes of this case. However, this finding flies in the face of the stipulations of the parties and the undisputed proof at trial."

The trial court determined after hearing all the evidence that McDill and Lakes Resort were alter egos and were the same entity for purposes of the facts of this case. This court stated the following concerning disregarding a corporate entity in *Neese v. Firemen's Fund Insurance Company,* 53 Tenn.App. 710, 386 S.W.2d 918 (1964):

It is generally recognized that a corporation is a separate entity; however, where there is a showing that the corporation is a mere sham or dummy, or is being used to defeat public convenience, justify wrong, or protect fraud, the corporate entity will be disregarded. *Fletcher on Corporations,* Perm.Ed. (1963), Secs. 25 and 41, and cases there cited. *See also Post Sign Co. v. Jemc's, Inc.,* 48 Tenn.App. 13, 342 S.W.2d 385, wherein it is stated:

"A corporation is usually treated as a separate entity. (citing numerous cases)

"The separate entity will be quickly disregarded, however, upon a showing that the corporation is a mere sham or dummy, or where necessary to accomplish justice."

*Neese,* 53 Tenn.App. at 717, 386 S.W.2d at 921.

Furthermore, quoting *Fletcher on Corporations,* Perm.Ed. (1963), Sec. 43, the *Neese* court stated:

"A very numerous and growing class of cases wherein the corporate entity is disregarded is that wherein it is so organized and controlled, and its affairs are so conducted, as to make it merely an instrumentality, agency, conduit, or adjunct of another corporation. The control necessary to invoke what is sometimes called the 'instrumentality rule' is not mere majority or complete stock control but such domination of finances, policies and practices that the controlled corporation has, so to speak, no separate mind, will or existence of its own and is but a business conduit for its princi-

pal. * * * One corporation may be disregarded where the two are identical or indistinguishable in fact. Unless it is a mere instrumentality or agency or adjunct in that sense, or as a sham or is used in fraud, by the dominant corporation, it will not be disregarded; and it will not be disregarded unjustly.

\*　　\*　　\*　　\*　　\*　　\*

"Whether one is a mere agency or instrumentality or they are identical, is a question of fact to be proved by competent evidence, * * *."

*Neese*, 53 Tenn.App. at 718, 386 S.W.2d at 921–22.

In *Neese* two companies, First Trust Company (FTC) and Real Estate Management, Inc. (REMCO), were principally owned and wholly controlled by a single family, and the officers and directors were practically the same. Fireman's Fund was surety on a bond guaranteeing the fidelity of REMCO with respect to accounting for rents collected. FTC claimed indemnity from Fireman's Fund for failure of REMCO to account for rents collected for FTC. Both companies were in bankruptcy. Fireman's Fund defended FTC's claim on the theory that the two companies were indistinguishable because of common control and free intermingling of funds. The court affirmed a judgment in favor of Fireman's Fund.

On the facts of that case, the *Neese* court found:

In the present case, we think the evidence paints a picture of domination and control of the finances, policies and practices of both the parent corporation (First Trust Company) and the subsidiary corporation (REMCO) by Scott N. Brown, the majority stockholder and principal executive officer of both companies. This domination was so complete that neither corporation had any mind, will or existence of its own. Mr. Brown conducted the affairs of both corporations as though they were one company individually owned by him. The finances of each were treated as the finances of the other, and funds were transferred between the two companies indiscriminately so that their bank accounts amounted to a single treasury. Hiring for both companies was usually done by the same person. A number of employees of each corporation did work for the other. For several years and until January 1, 1962, the employees of both companies were paid on checks of REMCO; after that, all employees were paid on checks of First Trust Company. The two corporations were so integrated that they not only shared the same office space, they had the same phone number.

From the above evidence, we have concluded that First Trust Company and REMCO were "identical or indistinguishable in fact."

*Neese*, 53 Tenn.App. at 718–19, 386 S.W.2d at 922.

"The conditions under which the corporate entity will be disregarded vary according to the circumstances present in each case and the matter is particularly within the province of the trial court." *Electric Power Bd. v. St. Joseph Valley Structural Steel Corp.*, 691 S.W.2d 522, 526 (Tenn.1985) (a case which analyzed disregarding the corporate entity in the parent-subsidiary corporation context).

Here, the undisputed proof shows: McDill and Lakes Resort utilized the same personnel; Maynard Fernandez was president and chief financial officer of McDill and sole shareholder, sole director and president of Lakes Resort; McDill and Lakes Resort commingled funds, including the maintenance fees collections, which were deposited into the same account without regard to whom such collection payments were made; McDill and Lakes Resort shared the same business address and post office box; McDill and Lakes Resort shared the same letterhead; Lakes Resort was undercapitalized; Lakes Resort borrowed over $300,000.00 from McDill without any evidence of such debt or any legal obligation to repay the same; McDill and Lakes Resort failed to observe corporate formalities, failed to obtain appropriate corporate authority in the form of a corporate resolution to lend funds or to borrow funds from one another; the defendants and their president, Maynard Fernandez, commingled expenses; McDill and Lakes Resort failed to keep independent and separate

accountings of delinquent taxes prorated between them; Lakes Resort purportedly operated the Resort, but McDill set, assessed, and collected maintenance fees to be received by Lakes Resort in the absence of any receivables servicing agreement between Lakes Resort and McDill; McDill and Lakes Resort commingled collections by depositing them into the same bank account regardless of whether the collection payments were made payable to Maynard Fernandez, Lakes Resort, or McDill; and McDill and Lakes Resort used the same endorsement stamp for the deposit of the collections.

The trial court found, and we agree, that based upon the undisputed proof at trial "the distinction between these two corporations can be found only in the imagination of Maynard Fernandez." The trial court properly found that McDill and Lakes Resort were the same entity for purposes of this suit, properly found a contractual relationship between the plaintiffs and defendants with regard to the payments of maintenance fees in exchange for utilities and services, and properly found that there was a breach of the contract by these defendants.

## III.

■ Defendants next contend that the trial court erred in determining that the plaintiffs were entitled to exclusive use of the sixty acre lake located within the campground, based upon the restrictive covenants of record.

As evidence of their exclusive use of the sixty acre lake located in the Resort, plaintiffs rely on certain restrictive covenants which were recorded in the Register's Office of Cumberland County, Tennessee and which confine access to the lake "to property owners of Campout U.S.A., Inc. as well as Campout, Inc." Plaintiffs contend that although a Correction of Restrictions instrument was recorded in the Register's Office which allowed the membership owners access to the lake, the attempted modification is ineffective and void, because it was neither executed nor consented to by the property owners.

The plaintiffs did not join as parties to this suit, either the current owner of the Resort, Thousand Adventures of Tennessee, or the Resort members they seek to exclude from the use of the lake. Plaintiffs did not address this omission in their brief.

The parties stipulated that defendant McDill sold the property to Thousand Adventures of Tennessee in 1992. The parties also stipulated that the property is subject to rights of membership campers sold by a contract, which defendants allege is similar to a license for use. The record shows there are hundreds of members who hold such licenses.

Tennessee Rule of Civil Procedure 19.01 provides:

A person who is subject to the jurisdiction of the court shall be joined as a party if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest.... If he has not been so joined, the court shall order that he be made a party.

Tenn.R.Civ.P. 19.01.

Tennessee Rule of Civil Procedure 19.03 provides: "A pleading asserting a claim for relief shall state the names, if known to the pleader, of any persons as described in Rule 19.01(1)–(2) hereof who are not joined, and the reasons why they are not joined."

The trial court was without jurisdiction to exclude the Resort members from access to the sixty acre lake without bringing those members, as well as the current owner and operator of the Resort, before the court. See *Citizens Real Estate & Loan Co. v. Mountain States Dev. Corp.,* 633 S.W.2d 763 (Tenn.App.1982) wherein a judgment was vacated and the cause remanded to join owners of adjacent lots in a boundary dispute.

The sale of memberships began under a prior developer in 1981 under the ownership of Campout, Inc. This developer initially filed the restrictions relied upon by the plaintiffs. Defendants argue the restrictions can be construed to confine use of the sixty acre lake to lot owners and members so as to exclude only those who have no interest in the Resort whatsoever from the use of the

lake. This argument is rendered even more plausible by the fact that the lot owners acquiesced in the members' use of the lake for approximately ten years before the present lawsuit was filed.

However, even if the restrictions are to be interpreted as they were by the trial court, restrictive covenants are rendered unenforceable by abandonment. Abandonment is defined as "community acquiescence" to continued violations of such restrictions.

■ However, in order for community violation to constitute an abandonment, it must be so general as to frustrate the object of the scheme with the result that enforcement of the restriction involved would seriously impair the value of the burdened lot without substantially benefiting the adjoining lots. Accordingly, sporadic and distant violations do not in themselves furnish adequate evidence of abandonment, although they may be considered in connection with outside changes. 20 Am.Jur.2d *Covenants, Conditions, Etc.* § 272 (1965).

The right to enforce a restrictive covenant may be lost due to such acquiescence by waiver or estoppel:

This is so, for instance, where, by failing to act, one leads another to believe that he is not going to insist upon the covenant, and such other person is damaged thereby, or whereby landowners in a tract or subdivision fail to object to general and continuous violations of restrictions. If the party entitled to the benefit of the covenants in any way by inaction lulls suspicion of his demands to the harm of the other or if there has been actual or passive acquiescence in the performance of the act complained of, then equity will ordinarily refuse aid.

20 Am.Jur.2d *Covenants, Conditions, Etc.* § 273 (1965).

In the instant case, the plaintiffs' acquiescence resulted in the sale of hundreds of memberships to purchasers who, prior to this lawsuit, had unfettered access to the lake. If there is to be an injunction against further use of the lake by the membership campers, the members and the current resort owner must be given an opportunity to be heard.

We are of the opinion that the plaintiffs failed to join indispensable parties so that this matter could be determined. The trial court's finding that plaintiffs were entitled to exclusive use of the sixty acre lake must be reversed and the cause remanded so that indispensable parties may be joined and this issue properly determined.

## IV.

■ As we have earlier determined, an express contract existed between plaintiffs and defendants with respect to the payment of maintenance fees in exchange for utilities and services. In this state, no right exists in law or equity which allows a party to abandon an express contract and seek recovery in quantum meruit or under an implied contract theory. In *Fletcher Realty, Inc. v. Hayslope Properties,* 712 S.W.2d 478 (Tenn.App.1986), a realtor sought to avoid the terms of an express agreement regarding commission on the sale of property and to recover on the basis of quantum meruit. This court rejected that claim stating "[i]t is a general rule of law that an implied contract or quasi-contract will not be imposed in circumstances where an express contract or agreement exists." *Fletcher Realty,* 712 S.W.2d at 481 (citing 66 Am.Jur.2d *Restitution and Implied Contracts* § 6 (1964)). Defendant Lakes Resort/counter-plaintiff filed a counter-complaint, an amended counter-complaint, and a second amended counter-complaint, but it never sought recovery on the basis of an express contract. Instead, counter-plaintiff contended it should be "reimbursed by the lot owners on the basis of unjust enrichment, quasi-contract, quantum meruit, or implied contract."

Therefore, the trial court properly dismissed the counterclaim of Lakes Resort. The trial court also properly found that even if defendant/counter-plaintiff had been able to proceed on its theories, it did not present the requisite proof to recover. Lakes Resort sought to recover from the plaintiffs not only the estimated costs of electricity; water; and sewer services provided to the plaintiffs, but also land rent; service charges; charges for access to various amenities, some of which were utilized by some plaintiffs and some of

which were not; and various and sundry administrative expenses, including utilities provided to employees of McDill at residences outside the resort.

We have considered each of the issues presented by the defendants and with the exception of the restrictive covenants/failure to join indispensable parties issue, find them to be without merit.

It therefore results that the judgment of the trial court is affirmed with the exception of the enforcement of the trial court's judgment which holds that the plaintiffs are entitled to exclusive use of the sixty-acre lake located within the campground. As to that finding, the cause is remanded to the trial court so that indispensable parties may be made a party to this lawsuit and for the proper disposal of this issue. Costs on appeal are assessed one-half to defendants and one-half to plaintiffs.

McMURRAY and SUSANO, JJ., concur.