IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
April 16, 2019 Session

## RIVER PLANTATION HOMEOWNER'S ASSOCIATION, INC. v. R. RANDALL CAPPS, ET AL.

**Appeal from the Chancery Court for Greene County**
**No. 20130205      Douglas T. Jenkins, Chancellor**

_____

### No. E2018-01084-COA-R3-CV

_____

This appeal arises from a lawsuit concerning the enforcement of restrictive covenants in a subdivision. River Plantation Homeowner's Association, Inc. ("the Association"), later joined by certain individual property owners ("Plaintiffs" collectively), sued property owners R. Randall Capps and his wife Carolyn Brown Capps ("the Capps") in the Chancery Court for Greene County ("the Trial Court") seeking enforcement of a restrictive covenant requiring homeowners to have a paved driveway. The Capps have a gravel driveway and wish to keep it. The Trial Court found in favor of Plaintiffs and ordered the Capps to install a concrete driveway. The Capps appeal, raising several issues, including one as to whether the Association lacks standing. We hold, *inter alia*, that the Association, although not specified in the restrictive covenants as a party capable of suing to enforce restrictions, has standing to do so. In light of the unambiguous driveway restriction and the fact that the Association never waived enforcement, we affirm the Trial Court's judgment in favor of Plaintiffs. However, we modify the Trial Court's judgment to allow the Capps, if they so choose, to use asphalt instead of concrete, as the Association has no objection to it. In addition, we reverse the Trial Court's decision to not award Plaintiffs their attorney's fees incurred in successfully bringing this enforcement action where the restrictive covenants specifically provide for such attorney's fees. We, therefore, remand for the determination and award to Plaintiffs of reasonable attorney's fees. Otherwise, we affirm the judgment of the Trial Court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed as Modified, in Part, and Reversed, in Part; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which RICHARD H. DINKINS and JOHN W. MCCLARTY, JJ., joined.

Thomas C. Jessee, Johnson City, Tennessee, for the appellants, R. Randall Capps and Carolyn Brown Capps.

William S. Nunnally, Greeneville, Tennessee, for the appellees, River Plantation Homeowner's Association, Inc. and Robert Clayton Northrop, Tammy Northrop, Teddy Brown Haley, Mary June Haley, Steven Goad, Jan Willis McAlpin, and Judy A. McAlpin.

## OPINION

### Background

River Plantation is an upscale subdivision in Greene County, Tennessee. The Capps are residents of River Plantation. Construction began on the Capps' home in 2005 and concluded in 2007. Restrictive covenants run with the land in this community. The restrictive covenants provide, as relevant:

> 5. DRIVEWAYS: Before any construction is begun, a temporary driveway shall be installed and said drive shall be crowned and have proper drainage so that overflow, if any, from the building site shall not flow upon the main road. After construction is completed, the driveway shall be constructed of either concrete or a surface approved by Developer. Owners shall be responsible to reimburse Developer for any cost for removal of debris or for damage to public streets caused by the owner or his agents.

> \*\*\*

> 12. TERM: Each and every one of the aforesaid covenants, conditions, and restrictions shall attach to and run with each and every lot of land; and all titles to, and estates therein, shall be subject thereto and the same shall be binding upon each and every owner of said lots until October 15, 2019, and shall be extended automatically for successive period of ten (10) years, unless by action of a minimum of Sixty-Seven percent (67%) of the then owners of lots, the owners agree to modify these covenants and restrictions in whole or in part, provided that the instrument evidencing such action or modification must be in writing and shall be duly recorded in the Register's Office of Greene County, Tennessee. The Developer may amend these restrictions unilaterally at any time so long as it owns over Fifty percent (50%) of the lots shown on the recorded plat of the subdivision.

> \*\*\*

> 17. ENFORCEMENT: If any owner or their heirs or assigns shall violate or attempt to violate any of the covenants herein, it shall be lawful for any

other person or persons owning any real property situated in said RIVER PLANTATION SUBDIVISION, to prosecute any proceedings at law or in equity against the person or persons violating or attempting to violate any such covenants and either enjoin him or them from doing so and/or to recover damages or any other dues for such violations. Incident thereto, any successful enforcing party shall be entitled to recover from a party found to be in violation of these covenants, reasonable attorney's fees incurred in so doing, and the violator or violators shall also be liable for any such other and additional damages as may occur including, but not be limited to, court costs.

18. WAIVER: For the purpose of property improvements, as long as it retains record ownership of any lot in the subdivision, the Developer reserves the right to grant waivers from these restrictive covenants. Said waiver must be in writing and recorded in the Register's Office for Greene County, Tennessee. The grant of any waiver shall be conclusive proof that the waiver shall not materially effect the protective purposes sought by the Developer. Other owners of lots in the subdivision shall not be entitled to bring suit to enforce the compliance of the original restriction where a waiver has been given by the Developer, nor will any owner be entitled to recover damages from the Developer for any waiver granted it.

The Capps have a gravel driveway, which drew opposition from the Association. In October 2013, the Association, as successor to the developer, sued the Capps for breaching the restrictive covenants. The Association sought specific performance, costs, expenses and attorney's fees. The Capps filed an answer asserting a number of affirmative defenses, including the following:

1. The plaintiff's complaint should be dismissed for failure to state a claim upon which relief can be granted. The defendants further allege that the plaintiffs have failed to join all of the landowners of River Plantation Subdivision, Phase I. Because of all the existing variances approved, the defendants affirmatively allege that all landowners must be parties to this action.

***

3. The defendants affirmatively allege that they obtained approval from the developer to install a gravel driveway when the developer was in control of the homeowners association. The defendants affirmatively allege that they are in compliance with enumerated paragraph number five,

labeled Driveways, of the restrictive covenants of the River Plantation Subdivision, Phase I.

4. The defendants affirmatively allege that the slope of the defendants' residence in the River Plantation Subdivision, Phase 1 is steep and hazardous, thereby necessitating a gravel surface for health and safety reasons. The defendants affirmatively allege that to deny the defendants the gravel surface would place the defendants and their guests at risk. The plaintiff's denial also constitutes an unreasonable abuse of discretion by the plaintiff in applying enumerated paragraph number five, labeled Driveways, of the restrictive covenants of the River Plantation Subdivision, Phase I.

5. The defendants affirmatively allege that the plaintiff waived any objection and granted approval to the defendants' driveway surface by not alleging a violation of the restrictive covenants of the River Plantation Subdivision, Phase I until six years after the defendants' home was constructed and the defendants started their occupancy and use of the residence. The defendants would affirmatively allege that their lender worked closely with the developer to confirm that the driveway access ultimately approved by the developer was in compliance in order to protect their first mortgage.

6. The defendants affirmatively allege that the plaintiff has either not enforced or selectively enforced the covenants and restrictions of the River Plantation Subdivision, Phase I, thereby rendering such covenants and restrictions unenforceable.

This matter was tried in June 2017, by which point certain subdivision property owners had been added as plaintiffs. Subdivision developer Glen Glafenhein testified regarding whether he ever had approved the Capps' gravel driveway:

Q. Okay. Well, let's do it like that. What if somebody said, "I want to just do a gravel driveway"?
MR. JESSEE: Objection, Your Honor. It's speculative.
THE COURT: Overruled. I think he can answer that. Go ahead.
A. No. I wouldn't have approved a gravel, a soft surface next to a hard surface for erosion purposes.
Q. All right.
A. You know, if you've got dirt and gravel going out onto a street, that's not, that's not something you want to do.
Q. Do you recall having any discussions with Mr. or Mrs. Capps about that subject?

-4-

A. I talked to Carolyn probably a year ago, and she was -- we had [a] phone conversation, and I basically said I don't recall. She said that I represented that I may have given a variance on the driveway there, and I don't recall doing that. And I don't believe I would because of very reasons [sic]. Now typically I'll look at a situation because in the restrictions it allowed if something came up for me to look at where I didn't think it would hurt the value or hurt the neighborhood, I could make clarity to what my intent was when I wrote the -- had the restrictions written. So I mean I did keep something in. I know Carolyn's driveway is long, and we did have a conversation, and. . .

Q. Do you know about when you had a -- would there have been an earlier conversation besides the one that took place about a year ago?

A. I'm sorry. I just -- I mean if I did, I don't recall.

Q. Okay.

A. So I apologize. I mean it's. . .

Q. Do you have any recollection of ever granting Mr. or Mrs. Capps permission to just have a gravel driveway as opposed to a hard surface or concrete driveway?

A. No. I don't. I'm sorry. I don't.

Q. Do you -- looking backwards or with your knowledge of what you do, would you have consented to a request of a. . .

MR. JESSEE: Objection, Your Honor. Speculative. What he would have done in the past? He's answered and says he doesn't remember.

THE COURT: I'm going to let him -- I'm going to let him -- overruled. Go ahead.

Q. To the extent that she will testify or has testified that you gave her some sort of permission to just keep a gravel driveway, would that be true?

A. No. I don't recall that. If I had looked at the situation, you know, her drive, I've got a Google map so I can see switchbacks and everything, you know, I'll just -- if this came to me today and I was the developer, I would look at it, and I could see where you could probably pave the drive maybe until you got to where there wasn't a problem with erosion, where it wasn't going to hurt anyone and probably would have given her a variance. But that would be, you know, sitting and studying and looking at it. Typically, if I do that, and I've done some variances, I get with both of the adjoining neighbors because I wouldn't tick a neighbor off because they already own. So I would have a document prepared to give the neighbors to agree if I did anything like that. So I look at it, and I can see -- I could see where maybe that needed to be done, but that's none of my business.

Q. Do you have any recollection or any records that suggest that you did such a thing in this case?

A. No.

Q. What is the concern about gravel in a steep, a relatively steep area? What's the problem with that?

A. Well, you're coming from a good hard surface road, and you're -- if you've got dirt and rock going out on the road, that's not good for, you know, the community. I mean you don't want erosion going on the road and having to have clean-up. I mean. . .

Q. And is that the -- what is the effect of rain or heavy rain on gravel, and what does the effect of gravity do?

A. Well, it becomes a maintenance issue. I mean, you know, if you're in a city or a town, they're going to require a certain amount of asphalt so that doesn't happen. But that would be the purpose of a hard surface connecting to the existing county hard surface road. That's. . .

Q. Now, again in searching your memory back, do you have any recollection of ever giving any kind of consent, oral or otherwise, to the Capps to not have to pave, you might say, their driveway?

A. No. I don't recall that.

Q. Okay. Let me call your attention to. . .

THE COURT: Have you got what you need?

Q. Yes.

THE COURT: Let me ask you a question while he's getting ready there. Did you ever grant a variance on anything? Did you ever grant a variance?

A. Yes. Usually in a subdivision of this size something will come up where I could grant a variance for clarity of what the intentions were.

THE COURT: So you remember granting one or more in this?

Q. We're about to talk about it.

THE COURT: Okay. I was going to ask you how did you do that? Did you just over the phone go, "Yeah. Go ahead. It's fine," or did you have something prepared and signed?

A. We would have a paper trail. We'd put it in a, some type of agreement.

THE COURT: Okay.

***

THE COURT: Well, in response to their assertion, it might be more safe graveled. Are you saying you don't agree with that or you do?

A. Well, if you have ice on the road and maybe in certain circumstances, g[r]avel would be -- I mean I'm sure there are -- you know, if you've got ice, you'd probably be better off with gravel than being an asphalt or a concrete drive.

-6-

Mark Brannan, owner of a lot in River Plantation and a former President of the Association, testified regarding a conversation he had with Mrs. Capps sometime in 2009 about the Capps needing to pave their driveway:

Q. What was the substance of your discussions with Mrs. Capps? What did you say to her, and what did she say to you as best you recall?
A. In the first discussion as I recall and the reason I remember this, because she told me why they hadn't paved it. It was around the weather condition, and that's why I remember that. You know, we had the conversation, and it was the intention to look at possibly getting it paved, but the reason they didn't want to do it is 'cause of the weather, getting up and down the driveway.
Q. All right. Did you give her any kind of consent or waiver of the duty to build such a driveway?
A. No, Sir.
Q. Did she indicate whether they were going to build the driveway or not?
A. As I recall, it was a -- it was still an open question in her mind if they were. So she didn't commit to do it or not to do.
Q. All right. So she also did not say, "We're not going to do it"? She didn't. . .
A. No. No. She did not.
THE COURT: Did she say Mr. Glen -- I can't say his last name. Did she say, "Mr. Glen waived it for me," or anything like that?
A. No, Sir.
THE COURT: Okay.
Q. All right, Your Honor. I know he's -- his time concerns. You're still a homeowner in the subdivision. Correct?
A. Yes, Sir.
Q. Are you in support of the efforts in this case to enforce the restrictive covenants?
A. Yes, Sir.
Q. Do you think the restrictive covenants are an important feature for the value of the homes in the subdivision?
A. Yes, Sir.
Q. During the time that you were a member of the Board of Directors, were there any variances or waivers granted to anyone on any particular issue that you recall?
A. No, Sir.
Q. Did you ever say anything to Mr. or Mrs. Capps that would have been misleading in nature or that gave them permission to do something that

maybe somebody else is saying now they can't do?  Anything like that ever happen?

A. No, Sir.

Q. Did you ever string them along or make promises to them that would have done away with the duty to build a driveway?

A. No, Sir.

***

Q. Do you recall you or your officers ever directing any letters to be sent to the Capps. . . .

A. No.

Q. . . .advising them they were in violation?

A. No, Sir.

Q. Okay.  Did you or any of the Board of Directors or members file any lawsuits?

A. No, Sir.

Q. Okay.  Did you verbally go tell them that if they didn't pave in a certain time period, you would either recommend or would, in fact, file a lawsuit to try to force the paving?

A. No, Sir.  We didn't have a threatening conversation.

Q. Okay.  Now would you agree with me that there are other violations existing in the subdivision today?

A. Yes.  I mean I'm -- yes, Sir.

Q. Okay.  And we've got satellite dishes.  We've got RV's.  We've got other issues.

A. Yes.  Some of that, some of that is somewhat -- there's interpretation around some of those that's a little more I would say in the gray zone, but it's -- obviously there's may [sic] be some question around some of those.  Yes, Sir.

Q. All right.  So you've got other issues that's been discussed in the meeting minutes for many years and no lawsuit's filed.  Correct?

A. I wouldn't know, if I'd say that.  I can't think of any particular issue that's been long going as this one.  So. . .

Q. Well, you would agree that during your watch no other litigation was filed on any other violations?

A. No, no litigation was filed.

Q. Okay.  And you agree that under Number 10, Nuisance, there's not supposed to be any tractors, trailers, buses, commercial vehicles, abandoned or parked vehicles on lots.  Motor homes, travel trailers or boats must be housed within garages.  No vehicles shall be parked overnight on

the street. You, still living there, know that that covenant is regularly violated, isn't it?

A. Well, yes, the one about the motor homes. That wasn't under my watch. So. . .

Q. Okay. Okay.

A. My time on the board. Let's put it that way.

R. Randall Capps testified to why he was so adamantly against paving his driveway, as well as his recollection that the developer gave him permission to use gravel:

Q. Okay. Now if coated with a substance that does not allow the water to percolate, concrete, asphalt, whatever, what are your concerns about the runoff?

A. Where is it going to go, and what are we going to do with it? The gravel -- there's a couple things. When it percolates, so it absorbs a lot of the water, and then also it slows it down. So if we have a, say an asphalt pavement along there, all that additional surface area of water is going to be running off and increasing the burden on the existing drainage system we have. . . .

***

Q. Mr. Capps, we were talking about the construction and your discussions with Mr. -- the developer. I can't ever say his name. Anyhow, tell me what was discussed.

A. Yes. We'd wound up a meeting with him, and we wanted to discuss our driveway. Again, we'd gotten, we'd gotten it in, and we were at the very early stages of construction, maybe -- I don't remember the exact specifics, but maybe we had kind of leveled it out, and we were getting the lot ready for the building process. And so we'd been seeing with the trucks going up there and our own experience it was steep and getting apprehensive with respect to paving it, and we also were still working on the drainage issues and had drainage issues. So we set up when Glen was going to be in the area. He swung by, and he met with my wife and I. And so we talked to him about it, kind of walked around and looked. And he seemed very understanding and accommodating and he understood the drainage, and we talked to him about the concerns we had as far as inclement weather and kind of being able to break through ice or crusty snow and get through to the gravel and get a grip. And he said, "Okay." He said, "You can do a

-9-

gravel driveway." So we thought we'd be fine from that standpoint forward.

Continuing his testimony, Mr. Capps testified to non-conforming driveways in the subdivision as evidence he and his wife were being singled out:

Q. Okay. Are you aware of driveways in your subdivision, One, that are other than concrete. . .
A. Yes.
Q. . . .that you've personally seen?
A. Yes.
Q. Describe that to the Court.
A. Well, we've got the Abernathy/Carrino shared driveway with the Oldenbergs, which if you're looking at our house is on the right. It's asphalt, and then the Carrinos turns into gravel when you go -- continue on up to their house.
Q. Okay. Has that been gravel as long as their houses have been there?
A. Yes. To my knowledge, yes.
Q. Okay.
A. If you look at our house, on the left Terry Leonard's house has an asphalt, blacktop. . .
Q. Asphalt, not concrete?
A. Correct. Uh-huh. And then if you go to the entryway when you first come into the complex, on the left the Davis house is all gravel.
Q. Okay.
A. And you come into the complex and you get to the first stop sign and go right, that's Holly Creek. That's that quasi gravel/asphalt county roadway. Sometimes they'll have gravel, and they'll just put some asphalt over it a little bit. You'll see when you go there. But on the left there are two houses. One has just -- it has some gravel along the front of it, a strip of maybe a foot, but the second one, and I think Mr. Nunnally had shown one picture of it. We might have a better one, but there's no question that it's gravel, and it's gravel from the Holly Creek Road up to the area that's concrete that they've done, and that's kind of where their house and entryway and garage entrances are. So they've got the street, maybe five feet or so of gravel and then concrete. And in my mind that's the same thing we have. We've got the street. We've got gravel, and you go up, and then they have concrete. We have the same setup at our house, but we've got more gravel, but, you know, that seems like it's compatible with what we do.

-10-

Carolyn Capps testified to not remembering the conversation that Brannan stated he had with her about the driveway, as well as her recollection of when she first became aware that the Association had a problem with the driveway:

Q. Okay. At any time to your knowledge did any of the board members reference in these meeting minutes that we've filed, which I believe is all they can find, confront you other than the letter that went out that started this lawsuit?
A. No, Sir.
Q. Okay. Going back to when the gentleman who was here in the blue shirt, Brannan, Mr. Brannan, do you remember when he was president of the association?
A. Yes, Sir.
Q. Do you remember the approximate time in relation to when you built your house?
A. It was after we built our house. We had no association for a long, long time after we built our house. It was just the developers. So it was way after that. The first two went bankrupt, and then we had a public auction, and then we had a quasi. . .
Q. So we had a Homeowner's Association at some point. Do you remember this gentleman being involved with the Homeowner's?
A. Yes.
Q. Do you remember ever discussing with him the need to pave your driveway?
A. No, Sir.
Q. Okay. He specifically said he remembers talking to you about it. Are you saying it didn't happen or you just don't remember?
A. I do not recall talking to him about my driveway.
Q. Okay. Needless to say, I think he said he served in '09. Other than the one letter that we reference, possibly two, but the one letter certainly we reference from 2002 when you bought your lots to 2005 when you started construction of the house when the road was in -- or driveway was in, 2007 when you moved in the house, during any of those years did you ever receive anything orally, in writing, over the phone, in person up until those letters were sent telling you that you needed to pave that driveway?
A. No, Sir.

\*\*\*

-11-

Q. Okay. Now you're also telling the Court you did not receive the June 19, '12 letter from the board warning about litigation if the driveway weren't built. You all didn't get that letter?
A. No.
Q. But you did get the letter from Scott Hodge that was dated March of '13 before this lawsuit was filed in October of '13?
A. Yes, Sir.
Q. When you received that letter, would it have been soon after it was sent, or do you remember?
A. I don't recall.
Q. Do you think it was a certified letter?
A. Yes, Sir.
Q. Do you think you or your husband signed for it, or could it have been someone at your home, a caretaker or someone?
A. It was our caretaker.
Q. Caretaker. And did he send it on to you?
A. Yes, Sir.
Q. Okay. And I asked the question at deposition, "What did you do in response to that?", and I believe you said not anything.
A. I became very ill after that, and I really don't recall.

In October 2017, the Trial Court entered its judgment finding in favor of Plaintiffs and ordering the Capps to install a concrete driveway. The Trial Court stated, in part:

The post-trial motion filed by the Plaintiffs, to supplement the record, should be overruled: all Plaintiffs and the Defendants in this cause are found to have standing to bring the subject action alleging the violation of Restrictive Covenants by the Defendants for failure to build a concrete driveway; the Plaintiffs are all of the parties necessary in order for the Court to adjudicate the merits of this cause, with finality, and the Defendants' motion that all owners in the subdivision must be made parties to this cause should be overruled, because complete relief can be afforded to the parties based upon the existing parties to this cause; and it further appearing to the Court that the Restrictive Covenants applicable to River Plantation Subdivision, recorded at Book 159A, page 1041 in the Register's Office for Greene County, Tennessee, and in particular Section 5 having to do with driveways, are binding, valid, and enforceable; and it further appearing that the Defendants' contention that the Restrictive Covenants and the application of same to them and their driveway were waived is not established by preponderance of the evidence, and even a mere letter from the developers to the Plaintiffs, as alleged by them, although said to be lost,

-12-

would not have been sufficient to waive Paragraph 5 of the Restrictions, as that could only be done, as required by Paragraph 18, by recordation of a written waiver in the office of the Register of Deeds for Greene County, Tennessee; it is further found that other alleged violations of the Restrictive Covenants by other residents do not preclude the enforcement of Paragraph 5 as to these Defendants nor render it enforceable and it is found that Plaintiffs may not recover attorney's fees from Defendants because there is no contractual basis for it;

IT IS, THEREFORE, ORDERED, ADJUDGED, AND DECREED AS FOLLOWS:

1. Plaintiffs Post-Trial Motion to Supplement the Record is overruled;

2. Defendants' Motion to Dismiss for Failure to Join all Necessary and Indispensable Parties is overruled;

3. The Defendants shall construct a concrete driveway upon their entire driveway from the public street to the entry into their residential courtyard area within twelve (12) months of the date of the entry of this Judgment; and

4. The Plaintiffs' request for the award of attorney's fees is denied.

The costs of this cause are taxed to the Defendants, together with all discretionary costs, with a copy of the bills for discretionary costs being attached hereto.

The Capps thereafter filed a "motion to reconsider" pursuant to Tenn. R. Civ. P. 54.02 and 59. The Capps argued in part that the Association lacked standing to sue, stating:

According to paragraph 17 of the Restrictive Covenants, ". . .any person or persons owning any real property situated in said River Plantation Subdivision. . ." may enforce the provisions of the Restrictive Covenants. River Plantation Homeowners Association owns one parcel of property, known as the river pavilion. However, said property is not within the River Plantation Subdivision, as that term is defined in the Restrictive Covenants, as it is not a lot within the plat of record in Plat Cabinet E slides 207-212 in the Register's Office of Greene County. Therefore, River Plantation Homeowners Association does not have standing to bring suit to enforce the Restrictive Covenants. . . .

In their response to the Capps' motion, Plaintiffs argued that the Association does have standing, stating:

River Plantation Homeowner's Association, Inc. (HOA) was deeded a 1.57 acre tract of land that came from the area designated as the "River Park." It is a common area shown within the boundaries of the plat of River Plantation as shown on the map of same recorded at Plat Cabinet E, Side 205. See Exhibit A attached hereto. A copy of the said page is enclosed as Exhibit B. After a portion of the River Park Common Area shown on the plat was conveyed to an adjacent neighbor, the remaining 1.57 acres, adjacent to the water plant, was conveyed to the HOA by a deed dated May 2, 2005, recorded at Book 385A, page 2718 in the Register's Office for Greene County, Tennessee. See Exhibit A. Accordingly, the HOA is the owner of the remaining area of the River Park and Pavilion that was referenced and established in Paragraph 15 of the Restrictive Covenants. The area was declared to be a common area for the use of property owners and family members and guests. Paragraph 17 declares that any owner of property situated in the River Plantation Subdivision may prosecute proceedings in law for violations of the Restrictive Covenants. The HOA is an owner of property within the Plantation of the area shown and included within the original recorded plat that was placed of record on October 12, 1999. . . .

Finally, Plaintiffs filed a motion to alter or amend the judgment, seeking attorney's fees pursuant to Paragraph 17 of the restrictive covenants. In May 2018, the Trial Court entered an order denying the parties' respective motions. The Capps timely appealed to this Court.

## Discussion

Although not stated exactly as such, the Capps raise the following issues on appeal: 1) whether the Trial Court erred in finding that the Association had standing to sue the Capps when the restrictive covenants do not explicitly grant the Association this authority; 2) whether the Trial Court erred in overruling the Capps' motion seeking to join all property owners in River Plantation subdivision; 3) whether the Trial Court erred in declining to find that the Association waived enforcement of the driveway provision; 4) whether the Trial Court erred in finding that Paragraph 5 of the restrictive covenants prohibited the Capps from having a gravel driveway; and, 5) whether the Trial Court erred in not allowing the Capps to defer paving their driveway until construction on the lot sharing their driveway, which they own, is completed. Plaintiffs raise their own issue of whether the Trial Court erred in declining to award them attorney's fees incurred in enforcing the restrictive covenants.

-14-

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001). Regarding witness credibility, our Supreme Court has stated:

> When it comes to live, in-court witnesses, appellate courts should afford trial courts considerable deference when reviewing issues that hinge on the witnesses' credibility because trial courts are "uniquely positioned to observe the demeanor and conduct of witnesses." *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000). "[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." *Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999); *see also Hughes v. Metro. Gov't of Nashville & Davidson Cnty.*, 340 S.W.3d 352, 360 (Tenn. 2011). In order for evidence to be clear and convincing, it must eliminate any "serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *State v. Sexton*, 368 S.W.3d 371, 404 (Tenn. 2012) (quoting *Grindstaff v. State*, 297 S.W.3d 208, 221 (Tenn. 2009)). Whether the evidence is clear and convincing is a question of law that appellate courts review de novo without a presumption of correctness. *Reid ex rel. Martiniano v. State*, 396 S.W.3d 478, 515 (Tenn. 2013), (citing *In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010)), *cert. denied*, —— U.S. ——, 134 S.Ct. 224, 187 L.Ed.2d 167 (2013).

*Kelly v. Kelly*, 445 S.W.3d 685, 692-93 (Tenn. 2014).

We first address whether the Trial Court erred in finding that the Association had standing to sue the Capps when the restrictive covenants do not explicitly grant the Association this authority. The Capps contend that the Association is not a property owner as defined in the restrictive covenants with the authority under Paragraph 17 to sue to enforce the restrictions. From our review of the record, the Capps are correct about this. While the Association owns a common area, it is not within the defined subdivision as marked on the plat. This, however, does not settle the issue.

The question remains whether Paragraph 17 of the restrictive covenants precludes the Association from bringing an enforcement action under a theory of *expressio unius*

*est exclusio alterius*,[1] or whether it merely clarifies that an individual homeowner also may bring an enforcement action. In a case from another jurisdiction useful to understanding the issue, the court discussed when homeowners associations have standing to sue to enforce restrictions:

> In determining whether an organization has standing, the court "should be satisfied that the organization before it is an appropriate one to act as the representative of the group whose rights it is asserting" (*Matter of Douglaston Civic Assn. v Galvin*, 36 NY2d 1, 7 [1974]). Here, it is reasonable to conclude that the plaintiff was formed as a "convenient instrument by which the property owners could advance their common interests and that it has a substantial identification with the real property owners" and, therefore, had standing to commence this action to enforce the covenant (*Westmoreland Assn. v West Cutter Estates*, 174 AD2d 144, 151 [1992]).

*Broadway-Flushing Homeowners' Ass'n, Inc. v. Dilluvio*, 97 A.D.3d 614, 616, 948 N.Y.S.2d 386 (2d Dep't 2012).

Additional context is found in a comment in the Restatement (Third) of Property: Servitudes, which illuminates the issue further:

> Historically there was some doubt whether an association met the technical requirements for enforcement of servitudes if it did not own land that benefited from enforcement. As explained in § 8.1, those doubts have long been resolved. Whether or not the association owns land, it has standing to sue to enforce servitudes benefiting the property of its members under the rule stated in § 6.11 and a legitimate interest in servitude enforcement under the rule stated in § 8.1.

Restatement (Third) of Property: Servitudes § 6.8, cmt. a (2000).

As discussed in these sources, a homeowners association has a legitimate and recognized interest in seeking to enforce restrictions applicable to its subdivision. That is especially so where, as here, the homeowners association consists of the property owners themselves. In other words, this is not an outside entity lacking connection to the interested parties. This is, instead, a representative group of the interested parties.

---

[1] "[T]he expression of one thing implies the exclusion of others. . . ." *Rich v. Tenn. Bd. of Medical Examiners*, 350 S.W.3d 919, 927 (Tenn. 2011).

Nevertheless, a homeowners association's authority to bring suit could be limited by statute or governing document. In the present case, no statute to that effect has been cited, nor do we interpret Paragraph 17 to limit the Association's enforcement power. Rather, Paragraph 17 provides simply that individual property owners also may sue to enforce restrictions. In the absence of any language limiting the Association from exercising the enforcement power generally retained by homeowners associations, we will not read such limitation into the restrictive covenants. We affirm the Trial Court in its determination that the Association has standing.

We next address whether the Trial Court erred in overruling the Capps' motion seeking to join all property owners in River Plantation subdivision. The Capps argue that all property owners in River Plantation were required to be joined in this lawsuit. In one case involving restrictive covenants and cited by the Capps in support of their contention, we opined that plaintiffs failed to join indispensable parties:

> The plaintiffs did not join as parties to this suit, either the current owner of the Resort, Thousand Adventures of Tennessee, or the Resort members they seek to exclude from the use of the lake. Plaintiffs did not address this omission in their brief.
>
> ***
>
> In the instant case, the plaintiffs' acquiescence resulted in the sale of hundreds of memberships to purchasers who, prior to this lawsuit, had unfettered access to the lake. If there is to be an injunction against further use of the lake by the membership campers, the members and the current resort owner must be given an opportunity to be heard.
>
> We are of the opinion that the plaintiffs failed to join indispensable parties so that this matter could be determined. The trial court's finding that plaintiffs were entitled to exclusive use of the sixty acre lake must be reversed and the cause remanded so that indispensable parties may be joined and this issue properly determined.

*Scandlyn v. McDill Columbus Corp.*, 895 S.W.2d 342, 348-49 (Tenn. Ct. App. 1994).

We do not interpret *Scandlyn*, or indeed any case cited by the Capps, as requiring the joining of each and every property owner whenever there is an action to enforce a restrictive covenant. *Scandlyn*, featuring a dispute over access to a lake, is particularly inapposite. The present case, by contrast, concerns whether the Capps should be required to pave their driveway in accordance with the restrictive covenants. It is of no

consequence whether the lawsuit was brought by the Association, an individual property owner, or some combination thereof. The matter is amenable to final adjudication as it is. This issue is without merit.

Turning from procedural issues to issues touching upon the merits, we next address whether the Trial Court erred in declining to find that the Association waived enforcement of the driveway provision. The Capps argue that the Association has waived enforcement of Paragraph 5 by waiting eight or nine years to take any action. In addition, the Capps note various other violations in the subdivision that have not sparked lawsuits as evidence that they are being singled out. They cite visible satellite dishes, trash cans and trailers as examples of unchecked violations of the restrictive covenants. The Capps also observe instances of certain other property owners in the subdivision having non-concrete driveways. The Capps demand similar treatment. With respect to when restrictions are abandoned, we have stated:

> [I]n order for community violation to constitute an abandonment, it must be so general as to frustrate the object of the scheme with the result that enforcement of the restriction involved would seriously impair the value of the burdened lot without substantially benefiting the adjoining lots. Accordingly, sporadic and distant violations do not in themselves furnish adequate evidence of abandonment, although they may be considered in connection with outside changes.

*Scandlyn*, 895 S.W.2d at 349. The right to enforce a restrictive covenant can be forfeited due to acquiescence via waiver or estoppel:

> This is so, for instance, where, by failing to act, one leads another to believe that he is not going to insist upon the covenant, and such other person is damaged thereby, or whereby landowners in a tract or subdivision fail to object to general and continuous violations of restrictions. If the party entitled to the benefit of the covenants in any way by inaction lulls suspicion of his demands to the harm of the other or if there has been actual or passive acquiescence in the performance of the act complained of, then equity will ordinarily refuse aid.

*Id*. (quoting 20 Am.Jur.2d *Covenants, Conditions, Etc.* § 273 (1965)).

The record does not support the Capps' contention that they are wrongly being singled out. First, the Trial Court did not credit the Capps' version of events whereby they received approval to keep their gravel driveway. We extend great deference to trial courts' credibility determinations. Second, the various trivial violations cited by the

Capps are readily distinguishable. A garbage can may be visible in plain sight one moment and gone the next, for instance, as opposed to a permanent driveway. With regard to the gravel driveway associated with the Davis property, a major example cited by the Capps, those lots are subject to a joint driveway agreement in which the driveway does not need to be paved until construction on the adjoining lot is completed. However, that in no way prevents the Association from otherwise seeking to enforce Paragraph 5 moving forward regarding others in dissimilar situations. Deferred construction as a basis for refraining from enforcing Paragraph 5 is an issue we address later in this Opinion.

We next address whether the Trial Court erred in finding that Paragraph 5 of the restrictive covenants prohibited the Capps from having a gravel driveway. The Capps assert that, owing to the steepness of their property and the length of their driveway, it was unreasonable for the Association to insist they pave their driveway. The Capps point out that Paragraph 5 does not mandate concrete exclusively, but allows for another "surface approved." With respect to the interpretation of restrictive covenants, our Supreme Court has stated:

> We are also mindful that courts construe restrictive covenants strictly because they are in derogation of the right to free use and enjoyment of property. *Williams v. Fox*, 219 S.W.3d at 324; *Arthur v. Lake Tansi Vill., Inc.*, 590 S.W.2d at 927 (citing *Waller v. Thomas*, 545 S.W.2d at 747). Any doubt concerning the applicability of a restrictive covenant will be resolved against the restriction. *Massey v. R.W. Graf, Inc.*, 277 S.W.3d at 908; *Parks v. Richardson*, 567 S.W.2d 465, 467-68 (Tenn. Ct. App. 1977). When the terms of a covenant may be construed in more than one way, courts must resolve any ambiguity against the party seeking to enforce the restriction and in a manner which advances the unrestricted use of the property. *Williams v. Fox*, 219 S.W.3d at 324 (citing *Hillis v. Powers*, 875 S.W.2d 273, 275-76 (Tenn. Ct. App. 1993); *Parks v. Richardson*, 567 S.W.2d at 468).

*Hughes v. New Life Development Corp.*, 387 S.W.3d 453, 481 (Tenn. 2012).

We find no ambiguity in Paragraph 5. Absent Association approval for another surface, property owners must have a concrete driveway. While the Capps have cited safety concerns with a paved driveway, the Trial Court evidently did not find the risk to be so great as to warrant ignoring the plain requirements of Paragraph 5. The evidence does not preponderate against the Trial Court's findings. In short, the Capps are violating the restrictive covenants and must pave their driveway.

In one respect, however, we agree with the Capps. Paragraph 5 does not limit property owners to having concrete driveways. Another "surface approved" will do. The Association has represented both in its brief and at oral argument that it has no problem with the Capps installing an asphalt, rather than concrete, driveway. We, therefore, modify the judgment of the Trial Court to permit the Capps to install either a concrete or asphalt driveway, whichever is their preference.

We next address whether the Trial Court erred in not allowing the Capps to defer paving their driveway until construction on the lot sharing their driveway, a lot they own, is completed. The Capps own three lots in the subdivision, with their house sitting on lots 69 and 70. Lot 68, which they also own, is available to build on. The Capps assert that they should not have to pave their driveway until construction on Lot 68 is completed lest the driveway be damaged, similar to the arrangement with Davis discussed above. However, there is no construction underway. Construction by the Capps is only a possibility. There is no suggestion that the lot is about to be sold so that someone else may build on it, either. Crucially, here, the Capps themselves own the adjoining lot, and if they choose, may never build on it. The Capps could theoretically postpone ever paving their driveway by pointing to hypothetical future construction that would damage the driveway, which would make a mockery of Paragraph 5. The Trial Court declined to read this proposal into the restrictive covenants, and we decline as well.

The final issue we address is Plaintiffs' separate issue of whether the Trial Court erred in declining to award them—and the Association, in particular—attorney's fees incurred in enforcing the restrictive covenants. To review, Paragraph 17 of the restrictive covenants provides, as relevant:

> Incident thereto, any successful enforcing party shall be entitled to recover from a party found to be in violation of these covenants, reasonable attorney's fees incurred in so doing, and the violator or violators shall also be liable for any such other and additional damages as may occur including, but not be limited to, court costs.

Plaintiffs argue that Paragraph 17 is clear—as prevailing parties in an enforcement action, they are entitled to an award of attorney's fees. In response, the Capps argue essentially that they should have won the case and, therefore, the Trial Court did not err in declining to award Plaintiffs attorney's fees. However, the Capps did not prevail, either below or on appeal. This being so, the Trial Court lacked flexibility under Paragraph 17 to deny an award of attorney's fees to Plaintiffs. We reverse the Trial Court as to this issue and remand for a determination and award to Plaintiffs of reasonable attorney's fees incurred in successfully enforcing the restrictive covenants, including those incurred on appeal.

## **Conclusion**

The judgment of the Trial Court is affirmed as modified, in part, and reversed, in part. This cause is remanded to the Trial Court for collection of the costs below and for further proceedings consistent with this Opinion. The costs on appeal are assessed against the Appellants, R. Randall Capps and Carolyn Brown Capps.

_____
D. MICHAEL SWINEY, CHIEF JUDGE